[Civ. No. 9031. Fourth Dist., Div. Two. Mar. 27, 1969.]

MAMIE J. SLAYTON et al., Plaintiffs and Respondents, v. OWEN WRIGHT, Defendant and Appellant.

Jacobs, Jacobs, Nelson & Witmer and M. Lyle Nelson for Defendant and Appellant.

Hurwitz & Hurwitz and Mark Hurwitz for Plaintiffs and Respondents.

KERRIGAN, J.—On September 14, 1963, the plaintiff, Mamie J. Slayton, and two co-employees of LaVida Mineral Springs, Nina Lackey and Robert V. Pague, sustained severe personal injuries when a water heater exploded in the main building of the health resort. The three employees filed separate actions for damages and named the following persons and firms as defendants: Gaffers & Sattler, Inc., the manufacturer of the Mission Heater which exploded; Claude Williamson, the plumbing contractor who supplied and was responsible for the installation of the heater; appellant, Owen Wright, a plumber who was in Williamson's employ in December 1957, when the heater was ordered, and who performed the actual installation work; Carrier Corporation, the manufacturer of another water heating unit located in the basement of LaVida Mineral Springs, known in the trade as a Day & Night Heater; and Wright & Eckart, a partnership composed of the appellant Owen Wright and Richard Eckart, the firm which supplied and installed the Day & Night Heater in December 1960. However, Carrier Corporation was dismissed as a defendant before the commencement of trial.

Plaintiff's spouse, Norman Slayton, joined in her suit against the purported third party tortfeasors and claimed damages for loss of his wife's services.

LaVida's workmen's compensation carrier, Guarantee Insurance Co., sought reimbursement from the third parties for benefits paid the three employees. It filed complaints-in-intervention in the Lackey and Pague suits and a separate action for benefits paid to Mamie J. Slayton. The employees' actions were predicated on negligence and strict liability. The defendants raised the concurrent negligence of the employer LaVida as an affirmative defense in each of the four actions.

The employees' actions and Guarantee's separate subrogation suit were consolidated for jury trial. Special verdict forms were submitted to the jury for a specific finding as to whether the employer, LaVida, was negligent and whether such negligence was a proximate cause of the explosion. The jury found that LaVida was concurrently negligent, and that such negligence was a proximate cause of the injuries and damages sustained by the three employees.

The jury returned verdicts against the plumbing contractor Williamson and his former employee Wright in the following

sums: Mamie J. Slayton—$250,000; Norman Slayton—$50,000; Nina Lackey—$100,000; and Robert V. Pague—$10,000. The jury found in favor of the defendants Gaffers & Sattler, Inc. and Wright and Eckart, a copartnership. In accordance with the findings contained in the special verdicts, Guarantee, LaVida's subrogee, took nothing.

Prior to rendition of the verdicts, counsel stipulated that all benefits paid by Guarantee to the time of trial could be deducted from the employees' verdicts. The following sums had been expended for compensation and medical costs: Mamie J. Slayton—$32,173.22; Nina Lackey—$22,677.65; and Robert V. Pague—$2,023.07. In the judgment on the verdicts, the court deducted the aforesaid sums from the awards in favor of the three employees. The net awards were: Mamie J. Slayton—$217,826.78; Nina Lackey—$77,322.35; and Robert V. Pague—$7,976.93. Subsequently, on motions for new trial filed by defendants Williamson and Wright, the court reduced the verdict in Norman Slayton's favor to $10,000.

This appeal from the judgment in favor of Mamie J. Slayton, Norman Slayton, Nina Lackey and Robert V. Pague is taken solely by Owen Wright. Williamson filed a notice of appeal but failed to perfect his appeal.

The water heating system located in the basement of the main building at LaVida Mineral Springs consisted of a 530-gallon storage tank with a Day & Night Heater at one end and a smaller Mission Heater at the other end. Two 1½-inch galvanized pipelines connected each heater to the storage tank. The bottom pipleines were utilized for cold water running from the tank to the heaters, and the top pipelines were for hot water running back from the heaters to the tank. A gate valve was located on each pipeline between the tank and the heaters. Thus, each heater had two gate valves. When both valves were closed, the water in the heater became isolated or "trapped." Operation of the Mission Heater was controlled by a probe-type thermostat located in the storage tank, with two aluminum lines running from the thermostat to the bottom of the heater where the pilot control was located.

The water heating system was originally installed in 1927 when the buildings were constructed. The source of the water was an underground reservoir located about ¼ mile from the resort. The temperature of mineral waters in the reservoir was approximately 112 degrees, and to maintain this temperature during use, and to allow for "lost" heat in traveling the ¼-

mile line to the storage tank, the thermostats in the heating system were set at 140-160 degrees. After the water was heated, it was then piped to the resort's bath house and hotel rooms for use.

The Mission Heater was sold by Williamson to LaVida in December 1957. Williamson directed the appellant to install the unit. Neither the manufacturer nor supplier ever equipped the heater involved with a temperature pressure relief unit—a safety device which releases excessive steam when water becomes overheated and exceeds the boiling point of 212 degrees Fahrenheit. A thermostat in the storage tank controlled the burners in the Mission unit but the evidence reflects that a thermostat may "stick" and not "cut off" the burners at the setting point.

In 1958 Williamson sold his plumbing business to appellant and Richard Eckart, and the latter parties formed a partnership. In December 1960 LaVida purchased a Day & Night Heater from the partnership. Appellant installed this unit at the other end of the basement as a replacement for an old heater. No temperature pressure relief valve was placed on the new unit, although the new heater was equipped with two thermostats. In addition to installing the new heater, the 1½-inch lines from the Day & Night Heater to the storage tank were replaced, and in removing the old lines, Wright observed that the insides were built up with mineral deposits to the extent that he could barely get one finger into the pipes. He called this to the resort manager's attention.

In April 1963, six months before the explosion, trouble developed in the Mission Heater. The burners would not go on. Wright's partner, Eckart, responded to a call from La-Vida to repair the unit. The thermostat in the storage tank, which was connected with the Mission Heater and actuated the Mission's burners, was apparently defective. The storage tank thermostat was known as a Titan BT 40. Eckart attempted to order a new Titan Thermostat from the supplier. The supplier told Eckart he would have to see the old thermostat to fill the order. Eckart removed a Grayson Thermostat from an old domestic heater he had on hand and which he intended to scrap. He returned to LaVida, removed the Titan Thermostat from the storage tank and installed the old Grayson Thermostat as a substitute. The probe of the Titan was approximately 8 inches; that on the old Grayson was only 4 inches. The Titan was sent to the supplier. Approximately two weeks before the explosion, the old Titan was returned to

Eckart with the order unfilled. At the time of the explosion, the old Grayson Thermostat which controlled the Mission Heater's water temperature was still in the storage tank.

On the day of the explosion, the manager was on vacation and his father-in-law acted as his replacement during his absence. About 1½ hours before the explosion, the acting manager was preparing to leave on a business trip to Bakersfield when he received a report of a leaky faucet in one of the tubs utilized by the guests. He visited the basement with the intention of turning off the water to the tub. He evidently first turned a valve located on one of the walls of the basement, but was informed by an employee upstairs that the faucet was still leaking. While his testimony was contradictory and conflicting, it appears that he closed one or both of the gate valves on the pipelines connecting the Mission Heater and the storage tank. Thereafter, he advised a young employee to tell the resort repairman that the valves should be fixed. He then left for Bakersfield. The youngster never saw the repairman before the blast.

The evidence is overwhelming that had the Mission Heater been equipped with a temperature pressure relief valve the explosion would not have occurred. Wright, himself, testified that before he installed the Mission Heater, he had been employed as a plumber in the Modesto area, and that it had been his practice to install such safety devices on both commercial and domestic water heaters. He further testified, when questioned on his failure to install such a temperature pressure device: "If I had have done [sic] what I would want to do, what I think really should be done [sic], I would [have] put in on there." Thermostatic control did not constitute an adequate safety measure because of the possibility of a malfunction.

There was further evidence that the explosion of the heater was at least partially caused by its becoming isolated from the storage tank. This condition occurred because the two gate valves on the 1½-inch lines were closed. Thus, the conduct of LaVida's acting manager on the day of the explosion, in hurrying down into the basement, closing the gate valves on the lines between the Mission Heater and the storage tank, and then departing on a business trip to Bakersfield, amply supported the jury's finding of LaVida's concurrent negligence.

When the heater burst, the three injured employees were working on the first floor in the area above the Mission Heater and had no warning of the explosion.

Mamie J. Slayton was 61 years of age at the time of the explosion. She lost both legs. Her left leg was amputated above the knee. An endeavor to fit her with artificial limbs proved unsuccessful, and she will be confined to a wheelchair for the remainder of her life.

The trial of these lawsuits commenced in January 1967. In August 1966, Mamie J. Slayton received a 100 percent permanent disability rating and award issued by the Workmen's Compensation Appeals Board. Under the award she is to receive $36.93 per week for 400 weeks from June 30, 1966, and thereafter a lifetime pension at the rate of $34.08 per week, together with lifetime medical treatment. This award amounts to some $58,000 plus medical care.

Nina Lackey was 60 years old on the date of the blast. Her legs were so badly injured that her physician originally believed she had lost them in the accident. When she was carried in on the stretcher, her legs were folded back on her thighs; she was suffering severely from loss of blood and trauma. Her doctor testified that he was "literally . . . shish-kebabbing bones back onto threaded wires in an attempt to hold the structures together." The left leg was a serious problem from the very beginning, and the doctor indicated that he still does not know why an amputation of the left leg was not done at the time. The large nerve and main blood vessels of the left leg were the only portions which remained intact. All of the wounds on the legs and feet were filled with foreign matter and debris. Secondary infection set in, which again made amputation appear inevitable. However her limbs were saved, but both feet require special shoes. She has a 3 x 8 inch metal piece permanently inbedded in one leg. She has undergone bone grafts. She may develop some drainage in either foot, and she may have to be hospitalized from time to time in the future for further surgery of the left foot. Her surgeon was of the opinion that she was unemployable. She probably will require the use of a cane for the rest of her life, and her future activities will be limited to maintaining a small apartment.

At the time of trial, Nina Lackey had not received a permanent disability rating and award, although there was an offer of evidence to the effect that her condition became permanent and stationary on October 15, 1966, and that the compensation carrier, Guarantee, began advancing payments on a permanent disability basis of $52.50 per week as of such date.

The defendants submitted an offer of proof to establish that

Mamie J. Slayton had received a permanent disability award amounting to some $58,000. Defendants further offered to prove by expert testimony that Nina Lackey would eventually receive a 100 percent disability rating from the Workmen's Compensation Appeals Board entitling her to $52.50 per week for 400 weeks and a lifetime pension of $48.42 per week, together with lifetime medical care. Her weekly benefits would amount to nearly $46,000. The trial court refused both offers.

However, no evidence was offered indicating that the third employee, Robert V. Pague, had received or would ever be entitled to a permanent disability rating and award.

Appellant claims the trial court erred in the following respects: (1) In denying a reduction in the judgment for the amount of future workmen's compensation benefits to be payable to Mamie J. Slayton and Nina Lackey; (2) in the admission of evidence; and (3) in the instructions to the jury.

The initial issue requiring resolution is whether a third party tortfeasor is entitled to a set-off or deduction from an employee's judgment of the amount of future workmen's compensation benefits payable to the employee when the employer is determined to be concurrently negligent. The third party defendants herein, including appellant, maintained throughout the trial that in the event they established concurrent negligence on the part of the employer, they were entitled to a reduction in the amount of any verdicts in favor of Mamie J. Slayton and Nina Lackey, not only for benefits paid, but future benefits as well. In substance, appellant contends that the Slayton judgment should have been reduced an additional $58,000, representing the value of her monetary award for permanent disability; and further, that Nina Lackey's judgment should have been reduced an additional $46,000, the value of future weekly compensation which may be payable to her. Inasmuch as no evidence was offered indicating that Robert V. Pague had been the beneficiary of a permanent disability award, or that he might be entitled to any future disability payments, appellant is apparently not urging that he was entitled to an additional set-off with respect to the Pague judgment.

Appellant's offer of proof relative to Nina Lackey indicated that she had not been rated for permanent disability at the time of trial; the offer of proof pertaining to Mamie J. Slayton established that she had received a permanent 100 percent disability award. Therefore, appellant challenges the net

amounts awarded Slayton and Lackey. The attack is predicated on the premise that the employer was found to be concurrently negligent in the explosion and that in failing to allow a set-off for future compensation benefits payable to the employees, the employer and his carrier will benefit from the employer's wrong as it will not be required to pay any further sum or future compensation to either Mrs. Lackey or Mrs. Slayton.

Under section 3858 of the Labor Code, where the employee obtains a judgment against a third party tortfeasor, after payment of litigation expenses and attorney fees fixed by the court pursuant to section 3856 of the Labor Code, and after payment of any valid employer's lien for compensation, ". . . the employer shall be relieved from the obligation to pay further compensation to or on behalf of the employee . . . up to the entire amount of the balance of the judgment, if satisfied, without any deduction. . . ."

Under section 3861 of the Labor Code, the Workmen's Compensation Appeals Board is empowered to credit against the employer's liability for compensation such amount as the employee obtains by way of judgment against the third party.

When an employee's injuries are compensable under the Workmen's Compensation Act, such compensation is an exclusive remedy against the employer. (Lab. Code, § 3601.) However, the injured employee also enjoys the right to bring an independent action against a third party whose negligence was the proximate cause of his injuries. (Lab. Code, § 3852.)

An employer who becomes obligated to pay compensation to an employee may recover the amount so expended against a negligent third party either by bringing an action directly against the third party (Lab. Code, § 3852), by joining as a party-plaintiff or intervening in the action brought by the employee (Lab. Code, § 3853), or by allowing the employee to prosecute the action himself and then subsequently applying for a first lien against the amount of the employee's judgment after an allowance for litigation expenses and attorney fees. (Lab. Code, § 3856, subd. (b).)

In any action brought by or upon behalf of the employee, the third party tortfeasor may assert the concurrent negligence of the employer as a *pro tanto* defense, and is entitled to have the judgment against him reduced by the amount of compensation paid. (*Witt* v. *Jackson*, 57 Cal.2d 57, 72 [17 Cal.Rptr. 369, 366 P.2d 641] ; *De Cruz* v. *Reid*, 69 Cal.

2d 217, 222-223 [70 Cal.Rptr. 550, 444 P.2d 342]; *State Comp. Ins. Fund v. Operated Equipment Co., 265 Cal.App.2d 759, 762 [71 Cal.Rptr. 531].) Therefore, if the employer was concurrently negligent, the third party secures a credit for the workmen's compensation paid by the employer; in the event the employer was free of negligence the employer is entitled to recover the benefits paid the employee. *(City of Sacramnto* v. *Superior Court,* 205 Cal.App.2d 398, 403 [23 Cal.Rptr. 43]; *State Comp. Ins. Fund* v. *Operated Equipment Co., supra.)* The rationale for the rule denying recovery to a negligent employer is that where the employer seeks to recover the amount paid from the third party tortfeasor, ''. . . his hands ought not to have the blood of the . . . injured workman upon them, . . .'' *(Brown* v. *Southern Ry. Co.,* 204 N.C. 668 [169 S.E. 419, 420].) ■ Stated more temperately, ''[I]t is contrary to the policy of the law for the employer, or his subrogee, the insurance carrier, to profit by the wrong of the employer.'' *(Lovette* v. *Lloyd,* 236 N.C. 663 [73 S.E.2d 886, 891-892].)

Applying the foregoing principles to the case under review, we are confronted with a situation where one employee (Slayton) had received a permanent disability rating and the other (Lackey) had not received a formal award although her condition had become permanent and stationary several weeks before the trial.

■ Where no rating has been made by the Workmen's Compensation Appeals Board [formerly Industrial Accident Commission] of an employee's permanent injuries, it is impossible for any court to determine the rating; the board has exclusive jurisdiction to determine compensation for permanent disability even where a third party action is brought before jurisdiction of the board is invoked or an award issued. *(Castro* v. *Fowler Equipment Co.,* 233 Cal.App.2d 416, 421 [43 Cal.Rptr. 589].) ''Even though a rating has been made by the . . . Commission [Board], it does not necessarily follow that the [employee] would receive all that such award would allow as it may be terminated by death or other events, and to require that the [employee] should have his judgment against the tortfeasor reduced [in the sum of the permanent disability award] would mean that [the employee] would not be able to collect on his common law right [to bring an action against a third party tortfeasor] but would have to wait for payments on a weekly basis. . . .'' *(Castro* v. *Fowler Equipment Co., supra,* 233 Cal.App.2d 416, 421.)

---

*This case was reported in 265 A.C.A. 863 under the title of *Quast* v. *Operated Equipment Co.*

■ While in *Castro* v. *Fowler Equipment Co., supra,* the employer's compensation carrier apparently waived its right to reimbursement for any additional benefits which might be paid to the employee, and there was no waiver by Guarantee of a right to a set-off of future benefits in the case under review, the absence of a waiver should not derogate from the employee's common law and statutory right of recovery against a third party tortfeasor. ■ The argument has been advanced before that plaintiff's recovery should be reduced not only by the amount which he had already received in compensation benefits but also by any amounts which he might receive in the future; however, the contention has been rejected as constituting an ''unusual and impractical extension'' of *Witt*. (*Conner* v. *Utah Constr. & Min. Co.,* 231 Cal.App.2d 263, 275 [41 Cal.Rptr. 728].) While in *Conner, supra,* no evidence was offered by the third party of the amount of the permanent disability award, or what it might be, while here such evidence was offered, the case stands for the proposition that the *Witt* doctrine should not be extended to allow a deduction for compensation benefits which might be payable in the future.

■ While it is true that in the absence of the Workmen's Compensation Act, a negligent third party would be allowed contribution against a concurrently negligent employer under the California Joint Tortfeasors Contribution Act (*Witt* v. *Jackson, supra,* 57 Cal.2d 57, 70; Code Civ. Proc., §§ 875, 880), the parties herein apparently assume that LaVida and its insurer, Guarantee, will be entitled, ipso facto, to a credit on both Mrs. Lackey's and Mrs. Slayton's permanent disability awards under sections 3858 and 3861 of the Labor Code. Such an assumption may, or may not, be valid, and the question will undoubtedly have to be resolved by the Workmen's Compensation Appeals Board, which tribunal has exclusive jurisdiction to resolve the issue. It would be conjectural to venture a prediction of what the board's decision might be in the event a petition for credit is filed by Guarantee. While the insurer would profit, notwithstanding the employer's negligence, in the event the credit were to be allowed, such an order does not appear inevitable.[1] ■ The

---

[1] If Guarantee's petition or application for a credit were to be denied, the employees would effect a ''double recovery'' as to future benefits. However, under the *collateral source rule,* compensation paid under the Workmen's Compensation Act is intended to benefit only the employee and not the third party tortfeasor who does not contribute to its procure-

California Supreme Court has used the following language in analyzing the reimbursement provisions of the Labor Code: ". . . there is nothing in the Labor Code to suggest that the Legislature contemplated that a negligent employer could take advantage of the reimbursement remedies that those sections provide. In the absence of express terms to the contrary, these [reimbursement] provisions must be deemed to be qualified by Civil Code section 3517 which provides that 'No one can take advantage of his own wrong'." (*Witt* v. *Jackson, supra,* 57 Cal.2d 57, 72.)

 No sound policy reason exists why the employees should be penalized from receiving the present benefits of a judgment and be required to reduce the amount of their recovery solely by reason of the fact that workmen's compensation is available.

 Under *Castro* v. *Fowler Equipment Co., supra,* 233 Cal.App.2d 416, Nina Lackey had not been permanently rated and, therefore, the trial court acted properly in rejecting the defense's offer of proof relating to the workmen's compensation benefits which might be paid to her in the future and in refusing to deduct the same from her judgment.

It would be incongruous to disallow the deduction in Nina Lackey's case and to allow the deduction from Mamie J. Slayton's judgment merely because the former had not received her rating while the latter had been rated. Under such a rationale, the deductions of future benefits would depend upon a purely adventitious occurrence—the time an award issued. Such a result would be unconscionable and strictly dependent upon chance.

In support of his set-off argument, appellant further maintains that in *Witt,* the court relied strongly on the rationale of *Lovette* v. *Lloyd, supra,* 236 N.C. 663 [73 S.E.2d 886, 892], where the following verbiage was utilized: ". . . [W]here the negligence of the third party and independent negligence on the part of the employer concur and proximately cause the injury to the employee, the third party may plead and prove the independent concurring negligence of the employer as a bar, *pro tanto,* to the recovery of the compensation paid or *payable. . . .*" [Last italics supplied.] Appellant maintains that the North Carolina Supreme Court therefore decreed that future benefits were deductible from the employee's judg-

---

ment, and it thus arises from a source wholly independent of the wrong-doer." (*De Cruz* v. *Reid,* 69 Cal.2d 217, 223-224 [70 Cal.Rptr. 550, 444 P.2d 342].)

ment. However, *Lovette* was a pleading case, the precise issue presented herein was not involved, and is consequently distinguishable from the case under review. Moreover, *Lovette* involved interpretation of a foreign statute; *Witt* and *Castro, supra,* relate to the construction of the California act.

Appellant next submits error occurred in the admission of evidence on the damage issue. Over objection, testimony was received of the earning capacity of Mrs. Slayton and Mrs. Lackey, as well as evidence of benefits paid them to the time of trial. Appellant therefore urges that there is a distinct probability that the verdicts in favor of Mrs. Lackey and Mrs. Slayton include damages for both loss of earning capacity and the amount of temporary compensation paid.

 Where the employee joins in or prosecutes a third party action, either evidence of the amount of disability indemnity paid or evidence of the employee's loss of earning capacity is admissible, but not both. (§ 3855, Lab. Code.) This rule allows an injured employee in a third party action to prove the amount of indemnity paid in support of his claim of damages instead of letting the court or jury fix the sum to be allowed for loss of earnings, medical and hospital charges. (*Pacific Indem. Co.* v. *California, etc. Ltd.,* 29 Cal.App.2d 260, 268 [84 P.2d 313].) The rule prevents prejudice to plaintiffs (*Huber* v. *Henry J. Kaiser Co.,* 71 Cal.App.2d 278, 285 [162 P.2d 693]) and defendants alike. (*Swearingsen* v. *Dill,* 21 Cal.App.2d 151, 153-154 [68 P.2d 388].)

 While it is error to admit evidence on both earning capacity and compensation benefits paid (*Huber* v. *Henry J. Kaiser Co., supra; Swearingen* v. *Dill, supra*), the record here indicates that there was no evidence presented of future disability payments but only testimony relating to the past earnings of Mrs. Lackey and Mrs. Slayton. Inasmuch as counsel stipulated that a deduction could be made by the trial court from the judgment for all benefits paid to the time of trial, the jury was not instructed to the effect that it should find plaintiff's damages without regard to the amount of compensation benefits paid. (BAJI 157-B, New.) However, it is difficult to comprehend how appellant can possibly maintain that the jury was misled in any manner and allowed the injured employees a double recovery. Grave injuries were sustained by Mrs. Slayton and Mrs. Lackey. The awards appear eminently fair. Moreover, counsel waived any error in view of the aforesaid stipulation. (See *Swearingen* v. *Dill, supra,* 21 Cal. App.2d 151, 153-154.)

Plaintiff next maintains that it was error to read a provision of the Uniform Plumbing Code into evidence. The code provided, in effect, that a hot water system, such as a Mission Heater, should be equipped with a pressure temperature relief valve. However the evidence reflects that counsel for appellant's former employer, Williamson, called the Orange County plumbing inspector as a witness. He inquired as to whether there was any requirement that a heater be equipped with a temperature pressure relief valve, and the witness replied that in December 1957, when the unit was installed, the Orange County Plumbing Code did *not* require that the heater be equipped with such a safety device. Williamson's attorney then asked: ''Now, was this Code superseded at some later date?'' The witness replied, ''Yes,'' and indicated that the board of supervisors amended the Code in March 1961. On cross-examination, counsel for the manufacturer, Gaffers & Sattler Corp., asked the same inspector whether the vast majority of installations put in by competent plumbers prior to 1957 used a temperature pressure relief device. The witness replied that the majority of plumbers did use such a device in Orange County prior to 1957.

Again, on cross-examination by counsel for the defendant-manufacturer, the inspector testified that the Orange County Plumbing Code contained no requirements for installation of a temperature or pressure relief valve in December 1957. Defense counsel also asked if the 1961 amendment of the Orange County Plumbing Code was based upon section 1313 of the Uniform Plumbing Code, and the witness replied in the affirmative. Gaffers & Sattler's counsel then brought out that the provision had been in the Uniform Plumbing Code since 1952.

The foregoing evidence was introduced without objection.

Later, the manufacturer's counsel inquired of his own witness whether section 1313 of the Uniform Plumbing Code of 1955 required the installation of a temperature pressure relief device in the type of heater involved in this explosion, and over objection, the particular code section was read into evidence. As written, the section makes it clear that a relief valve was required on the type of unit installed at LaVida Mineral Springs.

Counsel for appellant's employer, Williamson, objected to the reading of section 1313 of the Uniform Plumbing Code. Counsel for appellant did not object, nor did plaintiffs' counsel. Assuming that it was error to read section 1313

of the Uniform Plumbing Code into evidence, the error was invited by the defendants. Parties must abide by the consequences of their own acts and cannot seek reversal of their own errors which they committed or invited. (*Smith* v. *Royal Mfg. Co.*, 185 Cal.App.2d 315, 320 [8 Cal.Rptr. 417] ; *Shapiro* v. *Equitable Life Assur. Soc.*, 76 Cal.App.2d 75, 94 [172 P.2d 725].) Furthermore, the error could not have been prejudicial to appellant inasmuch as the testimony previously adduced reflected that the Orange County Plumbing Code did not require a safety device in 1957, and that it was not until 1961 that the Orange County code was amended so as to require the installation of a temperature pressure relief device. It is apparent that the error could have been detrimental only to the manufacturer since it was proof of the absolute necessity, from the standpoint of safety, that the Mission Heater be equipped with such a safety device when it delivered the unit to the supplier.

In his final attack on the judgment, appellant maintains that the court erred in the rendition of two instructions. The first instruction reads as follows :

"Plaintiffs contend that the defendant manufacturer, Gaffers & Sattler, hereinafter referred to as the 'Manufacturer,' and that the defendant plumbers, Claude Williamson and Wright & Eckert [*sic*], hereinafter referred to as the 'Plumbers,' are liable for personal injuries to the plaintiffs on either or both of the following theories which I am about to mention to you :

"First, plaintiffs contend that the defendant Manufacturer and the defendant Plumbers are liable because of their negligence, and second, because said defendant Manufacturer and said defendant Plumbers placed an article on the market which was defective.

"With regard to the theory of negligence, plaintiffs contend that the defendant Manufacturer was negligent, first, because it failed to equip the hot water heater which it manufactured and which exploded in this case, with a proper safety device or devices; and, second, and in addition thereto, that said defendant Manufacturer was negligent because, having chosen not to so equip the said hot water heater with such safety devices, it failed to exercise reasonable care commensurate with the risk involved, to inform, by adequate instructions or warnings, of the dangerous condition of the said hot water heater. In that connection, you are instructed that an adequate warning is one calculated to bring home to a reasonably

prudent user of the product the nature and extent of the danger of the product involved.

''Plaintiffs contend that the defendant Plumbers were negligent, in that they knew, or in the exercise of ordinary care should have known, that the failure to equip the said hot water heater with the proper safety device or devices would result in exposing persons in the vicinity of the said hot water heater to an unreasonable risk of grievous injury or death.

''I instruct you that the Manufacturer of an article and the supplier who places it on the market for use under circumstances where they know, or should know, that such article will or may be used without the installation of a safety device when the same is necessary or prudent to have, are liable for injuries proximately caused by the absence of such device of which the user was not aware, provided the article was being used in a manner which was reasonably foreseeable by the manufacturer at the time the product was placed on the market.''

A party is entitled to proper instructions on every material issue of fact upon which he relies when there is substantial evidence to support his theory of the case. (*Wilson* v. *City & County of San Francisco,* 174 Cal.App.2d 273, 275 [344 P.2d 828]; *Wagner* v. *Osborn,* 225 Cal.App.2d 36, 49 [37 Cal.Rptr. 27].) However, the foregoing instruction misstated the theory of strict liability in that it attempted to apply the doctrine against the appellant. A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being (*Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]), and a retailer selling such article is subject to the same rule. (*Vandermark* v. *Ford Motor Co.,* 61 Cal.2d 256, 263 [37 Cal.Rptr. 896, 391 P.2d 168].) This rule is applicable to only those engaged in the business of selling. (*Casetta* v. *United States Rubber Co.,* 260 Cal.App.2d 792, 801 [67 Cal.Rptr. 645]; Rest. 2d Torts, § 402A, pp. 350-351, com. f.) Obviously, the appellant was not the manufacturer or supplier of the Mission Heater. While he and his partner were the suppliers of the Day & Night Heater, the latter unit was not involved in the explosion. After the jury retired, the error was detected. The court then advised the jury that the theory of strict liability only applied to the manufacturer, Gaffers & Sattler, and the supplier, Williamson.

An erroneous instruction is not cured by the giving of other correct instructions where the effect is simply to produce a clear conflict in the instructions and it is not possible to determine which instruction was followed by the jury in arriving at a verdict. (*Lewis* v. *Franklin,* 161 Cal.App.2d 177, 185 [326 P.2d 625]; *Wilson* v. *City & County of San Francisco, supra,* 174 Cal.App.2d 273, 277.) Nevertheless, where the particular instruction is corrected to accurately state the law, the error is cured. (See 48 Cal.Jur.2d, Trial, § 204, p. 232.)

Appellant further maintains that the instruction specifically sets forth the plaintiffs' contentions on the issue of negligence and repeatedly reiterates their argument that the heater should have been equipped with a safety device. The giving of an instruction argumentative in form is error (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists,* 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64]; *Dodge* v. *San Diego Elec. Ry. Co.,* 92 Cal.App.2d 759, 764 [208 P.2d 37]), although it is not always cause for reversal. (*Roy* v. *Mission Taxi Co.,* 101 Cal.App.2d 438, 446 [225 P.2d 920]; *Estate of Clark,* 180 Cal. 395, 398 [181 P. 639].) An instruction that goes too elaborately into the particular facts relied on by one of the parties is an argumentative instruction. An instruction should state rules of law generally, rather than elaborate matters of evidence. (*Lenard* v. *Edmonds,* 151 Cal.App.2d 764, 774 [312 P.2d 308].) Any attempt to stress, overemphasize, or unduly make prominent selected portions of the evidence is in violation of the rule that instructions should not focus the jury's attention on particular items of evidence; "[T]he vice in any such instruction is that it unduly emphasizes one portion of the evidence, puts the court in the position of making an argument to the jury, and misleads the jury into thinking that because the court has specifically mentioned certain testimonial facts they are of undue importance or that the court believed them to be true." (*Powell* v. *Bartmess,* 139 Cal.App. 2d 394, 404 [294 P.2d 150].)

While it is improper to place detailed recitals of fact in instructions and to elaborate on particular facts relied upon by one party (*Tower* v. *Humboldt Transit Co.,* 176 Cal. 602, 609-610 [169 P. 227]), that portion of the foregoing instruction on the doctrine of strict liability has been judicially approved. (*Preston* v. *Up-Right, Inc.,* 243 Cal.App.2d 636, 640-641, fn. 4 [52 Cal.Rptr. 679].) The part of the instruction

relating to the issue of negligence correctly recited that the failure to equip the Mission Heater with a safety device was merely a contention. ▆▆▆ Instructions which merely state the claims of a party without intimating that such claims have been proved are not objectionable as being "extremely argumentative" and placing "undue emphasis" upon certain portions of the evidence, where they do not assume the existence of facts which are not in the evidence or with respect to which there is a conflict of evidence. (*Reed* v. *Simpson,* 32 Cal.2d 444, 452 [196 P.2d 895].)

▆▆▆ During its four days of deliberation, the jury twice indicated that it was having difficulty understanding the word "prudence" mentioned in several of the instructions. The court defined the word by reading from Black's Law Dictionary and Webster's Dictionary. Appellant requested that the court define the word in accordance with a form instruction (BAJI 101-B), and now maintains that the Webster definition was erroneous in that it equated "prudence" with "cautious," and that "prudence" does not always mean the same as cautious. However, the record reflects that the court clearly defined the word "caution" in a form instruction (BAJI 102-A). Furthermore, there is foreign authority that it is not error in a civil suit to use the words "prudence" and "cautious" interchangeably in defining negligence since the difference, if any, is considered insignificant. (*Suhr* v. *Lindell,* 133 Neb. 856 [277 N.W. 381, 385]; *Malcolm* v. *Mooresville Cotton Mills,* 191 N.C. 727 [133 S.E. 7, 9]; *Conroy* v. *St. Joseph Ry. Light, Heat & Power Co.,* 345 Mo. 592 [134 S.W.2d 93, 95].) Although criminal authority exists that the meaning of "prudence" does not embrace the word "cautious," even where it is so defined, the error is not deemed prejudicial. (*People* v. *Anderson,* 58 Cal.App. 267, 270-271 [208 P. 324].)

The judgment is affirmed.

McCabe, P. J., and Tamura, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 21, 1969.