[Civ. No. 5193. Fifth Dist. Feb. 9, 1982.]

THOMAS D. CURTIS, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA EX REL. DEPARTMENT OF
TRANSPORATION et al., Defendants and Appellants.

COUNSEL

Richard C. Voorhies and Al Schallau for Plaintiff and Appellant.

Downey, Brand, Seymour & Rohwer and Henry E. Rodegerdts as Amici Curiae on behalf of Plaintiff and Appellant.

Richard G. Rypinski, Gordon S. Baca, George L. Cory, Richard A. Wehe, Brelend C. Gowan, Kroloff, Belcher, Smart, Perry & Christopherson, Claude H. Smart, Jr., Harry A. Allen and Karen M. Land for Defendants and Appellants.

OPINION

**RODRIGUEZ, J.\***—This is an appeal by plaintiff from a verdict in his favor in a personal injury action for $2.02 million—the verdict eventually being reduced to a $331,790 judgment by the trial court.

## FACTS

At approximately 10:30 p.m. on the night of June 8, 1973, plaintiff was driving a White Freightliner tractor pulling two trailers southbound on Interstate 5 near the Orestimba Creek highway bridge. At that time he was employed as a long-haul truckdriver for Laura Scudders division of Pet Milk Company (Pet). Several hundred yards ahead of him was a moving van driven by Billy Fagan. Curtis was driving about 64 miles per hour. Fagan saw a black and white cow on the freeway ahead of time. Fagan swerved into the fast lane in an effort to miss the cow, but the cow reversed direction and was struck by the moving van. The cow was dragged some distance and was left on the highway in the slow lane. Fagan stopped his truck alongside the freeway and got out. Immediately thereafter, Fagan observed the truck driven by Curtis lurch into the air, giving the appearance of an airplane taking off. He stated that "It looked like an aircraft lifting off at the time. Then it came back over and all lights went out at the time and then from thereon it was more or less a cloud of dust...."

Officer Doyle Whisenhaunt of the California Highway Patrol investigated the accident in question. He testified that the truck swerved to the right, went over the shoulder and into an adjacent field where it struck a tree after traveling about 200 feet. The Freightliner and trailers were completely demolished.

The impact from the accident caused Curtis to strike his head on a beam situated above the driver's head inside the cab of the truck, causing severe cervical fractures and permanent quadraplegic paralysis. It is not disputed that Curtis is 100 percent disabled.

Alfred Mays, owner of the land in question and one of the original defendants, testified that about five days after the accident he discovered a section of the fence under the Orestimba Creek highway bridge

---

\*Assigned by the Chairperson of the Judicial Council.

was damaged. Some staples were pulled from the posts and some wires were down. A heifer's tracks were near the damaged fence. These tracks led up to the freeway. The fencing along the freeway was erected by the State of California when the freeway was built. The fence wire was attached to wooden posts by staples. All wire and staples were on the freeway side of the posts as opposed to the pasture side of the posts. Ramond Emery, who had been hired by the State of California and White Motor Corporation as an expert consultant in fencing and cows testified that a cow could walk and pass through the opening in the fence in question. He further testified that in his opinion the proper way to fence cattle to keep them from the freeway is to put the wire on the pasture side of the post because it gives a stronger fence in preventing livestock from getting out.

The White Freightliner driven by Curtis on the night in question was manufactured by Freightliner Corporation and sold by White Motor Corporation. It has a 16-gauge aluminum bar running transversely across the interior ceiling of the cab above and behind the driver's head. The bar serves as a hanger for the safety strap that keeps the sleeper passenger in place and also serves as a roof support and structural brace. The driver's seat was an air-ride seat designed to be free-floating from the road movements.

Plaintiff's experts testified that the defect in the Freightliner was the location of the beam in close proximity to the driver's head, in conjunction with the free-floating nature of the air-ride seat. The experts testified that when the Freightliner struck the cow, the front wheel rose into the air as if going up a ramp. After passing over the cow, the front wheels came down and the rear wheels went up. Because of the independent motion of the air-ride seat, the driver was going down into the seat while the front of the truck was going up, and the driver was then propelled upward while the front of the truck was coming down, causing the driver to strike his head on the safety curtain bar, resulting in fractured vertebrae. Plaintiff also introduced evidence that the use of a safety belt would not have prevented the injury.

Evidence was also introduced that showed that the beam provided additional strength to the cab roof and provided support for the safety straps which were required to protect the passenger riding in the sleeper.

The jury in the instant case was thoroughly instructed in the alternative theories of strict liability and negligence. The jury was given a modified version of BAJI No. 9.00.5 which included both prongs of the holding in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443]: "A product is defective in design [unless the benefits of the design of the product as a whole outweigh the risk of danger inherent in the design] [or] [if the product failed to perform as safely as an ordinary consumer of the product would expect when used in a manner reasonably foreseeable by the defendant.]"

However, while the jury was specifically asked to find by special verdict whether the benefits of the design of the product as a whole outweighed the risk of danger inherent in such a design, they were not also asked the question whether the product failed to perform as safely as an ordinary consumer of the product would expect.

The jury, by special verdict, found that White Motor Corporation (White), as seller of the product, was negligent and the negligence was the proximate cause of the injury to plaintiff. It also found that there was a defect in design of the product at the time it was sold and the design was the proximate cause of plaintiff's injury. However, in addition, the jury found by special verdict that the benefits of the design of the product as a whole *did outweigh* the risk of danger inherent in such a design.

The jury by special verdict also found that the property in question was in a dangerous condition at the time of the accident, this condition was a proximate cause of injury to the plaintiff, that it was reasonably foreseeable that injury to the plaintiff would occur because of such condition, that this dangerous condition was created by a negligent or wrongful act by defendant State of California (State), and that the State of California had actual or constructive notice of the dangerous condition within a sufficient time prior to the accident so measures could have been taken to protect against the dangerous condition.

While both defendants asserted the defense of concurrent negligence of plaintiff's employer, neither defendant introduced any evidence of employer negligence. In fact, both defendants withdrew this defense before the case was argued and submitted to the jury. Consequently the jury did not ever reach the issue of whether there was any negligence on the part of plaintiff's employer.

Following a three-month long trial the jury returned special verdicts in favor of plaintiff on January 19, 1979. Plaintiff was awarded as follows:

|  | | |
|---|---|---|
| | Medical damages— | $1,000,000 |
| | Past earnings— | $125,000 |
| | Future earnings— | $100,000 |
| | Pain and suffering— | $800,000 |
| Total | | $2,025,000 |

The jury determined comparative negligence to be:

|  | |
|---|---|
| Plaintiff— | 15 percent |
| State— | 50 percent |
| White— | 35 percent |

### DISCUSSION

A number of issues have been raised which will be discussed seriatim.

I. *Was the trial court's reduction of the jury verdict proper?*

A. *Contentions of the parties.*

Plaintiff's first and primary contention on appeal is that the trial court improperly reduced the jury verdict. From a jury verdict of $2,025,000, the trial court deducted $1,693,210, which is the total of the following amounts:

| | | |
|---|---|---|
| Total damages | | $2,025,000 |
| Plaintiff's comparative negligence (15%) | (303,750) | |
| Medical damages paid and to be paid by worker's compensation carrier | (1,000,000) | |
| Past disability paid by the carrier | (37,000) | |
| Future disability to be paid by carrier: $70 x 178 weeks | (12,460) | |
| Settlement monies received by plaintiff | (340,000) | |
| | | −1,693,210 |
| Plaintiff's Total Judgment | | $ 331,790 |

Plaintiff is joined on appeal by his employer's workers' compensation insurance carrier, Liberty Mutual Insurance Company (Liberty), as amicus curiae and urges that the trial court should have only reduced the verdict by the comparative negligence of the plaintiff ($303,750) and the settlement monies received by the plaintiff ($340,000)—resulting in a proper judgment of $1,381,250, plus costs.

The pertinent facts regarding Liberty's involvement in this suit are as follows:

1. On March 7, 1974, Liberty filed a complaint in intervention seeking to recover for workers' compensation benefits paid and to be paid in the form of disability payments and medical care.

2. On October 14, 1975, two defendants, Mays and Lopez (owner of the land and owner of the cow), settled with Curtis, Liberty, and Pet, for $290,000 ($100,000 went to Liberty and Pet).

3. Several weeks prior to trial Curtis settled with defendant Bostrom (manufacturer of the air-ride seat) for $50,000 (one-third went to Liberty and Pet).

Curtis also agreed with Liberty and Pet to guarantee Liberty's worker's compensation lien and Pet's property damage to a compromise figure of $150,000, *to be paid following any future "settlement" of plaintiff's case with the two remaining defendants, White and the State.* The $150,000 guarantee from any future "settlement" was to be reduced by the percentage of plaintiff's comparative negligence, if any. Pet would in turn dismiss its property damage claim and Liberty its complaint in intervention with prejudice. "[P]ayments on the workmen's compensation benefits will continue until any third party monies received by way of settlement, verdict or judgment are received by plaintiff's counsel." Liberty therefore agreed to continue to pay compensation benefits *to the time of judgment* in return for $150,000 (shared with Pet) for compensation benefits paid up to the time of judgment. The parties agreed to be "bound by the determination of employer's negligence, if any, which could affect the outcome of any issue of credit in this issue."

4. Liberty then dismissed its complaint in intervention with prejudice.

Just prior to trial plaintiff Curtis stipulated to the compensation benefits paid to date by Liberty. The court ruled that the source of the payment, workers' compensation, would not be given to the jury. Anticipated future medical payments, lost wages, and pain and suffering were to be presented to the jury as if the workers' compensation carrier were not involved. The jury was to make special findings on each issue of damages—i.e., pain and suffering, past medical, past earnings, future medical, and loss of earning capacity. The parties agreed that the court would decide the legal issue of Liberty's right to a credit against possible future worker's compensation payments, without giving up any appealable right.

Even though Liberty dismissed its complaint in intervention, the issue of plaintiff's employer's negligence was to remain an issue at trial. However, no evidence of any contributory negligence on the part of Laura Scudders/Pet was ever presented at trial, and at the time of review of proposed jury instructions, respondents White and State withdrew their request for a finding by the jury on the issue of the employer's independent negligence.

Defendant White contends that "The central issue on appeal is the legal effect to be given the dismissal with prejudice of Liberty Mutual's complaint in intervention." White contends that the dismissal of Liberty's complaint in intervention "operates as an adjudication on the merits of the case, and is therefore res judicata as to all issues raised in the pleadings." White's theory is that since the defendants raised the defense of employer negligence in their answer, Liberty's dismissal of the complaint in intervention operated to, in effect, decide the issue of employer negligence. White asserts that "under the final judgment following the dismissal with prejudice, plaintiff's employer was in effect found to be 100 percent negligent, and hence Liberty Mutual's right to claim reimbursement and/or credit is simply forever gone."

Defendant State of California argues that the dismissal with prejudice by the intervener operates as a final determination on the merits of the case and is therefore res judicata as to all issues raised in the pleadings; the effect of the dismissal with prejudice coupled with the agreement by intervener to pay plaintiff's medical and disability expenses with past and future forever discharged any obligation on the part of defendants to pay for said expenses.

Both the arguments of White and State are predicated on the theory that Liberty's dismissal with prejudice constituted a "de facto" determination that the employer in this case was 100 percent negligent.

Reimbursement rights were sought against White and State by Liberty in its complaint in intervention. Liberty could have also opted for a lien against Curtis' recovery or brought an action separately against White and State. (*Witt* v. *Jackson* (1961) 57 Cal.2d 57, 69 [17 Cal.Rptr. 369, 366 P.2d 641].) Liberty contends that when it dismissed its complaint in intervention it "partially waived" its *reimbursement* right but that this does not mean that it waived its right to a *credit* for future compensation obligations against the employee's recovery in a third party tort action. Liberty cites *Herr* v. *Workers' Comp. Appeals Bd.* (1979) 98 Cal.App.3d 321, 327-328 [159 Cal.Rptr. 435] for the proposition that the right of credit and the right to a lien in a third party action are separate and distinct. Liberty contends that the matter of credit, if any, which might be appropriate in connection with future workers' compensation benefits accruing is between Curtis and Liberty by way of agreement or proceeding before the Workers' Compensation Appeals Board.

Plaintiff contends that California law prohibits the trial court from reducing a jury verdict for future compensation benefits. (*Patterson* v. *Sharp* (1970) 10 Cal.App.3d 990 [89 Cal.Rptr. 396], *Slayton* v. *Wright* (1969) 271 Cal.App.2d 219, 233 [76 Cal.Rptr. 494].) Furthermore, Curtis contends that the trial court cannot reduce the jury verdict for workers' compensation benefits where there is no finding of negligence on the part of plaintiff's employer. (*De Cruz* v. *Reid* (1968) 69 Cal.2d 217, 226 [70 Cal.Rptr. 550, 444 P.2d 342].) Curtis further asserts that Liberty's voluntary dismissal did not constitute an adjudication of employer negligence.

The trial court in this case had an extremely difficult time in deciding what effect to give to Liberty's dismissal of its complaint in intervention. In its first "Decision re Judgment" the court laid out the problem and asked for further briefing by the parties. The court was concerned with the issue of whether the dismissal with prejudice could be a bar to litigating the employer's (Laura Scudders/Pet) negligence before the Workers' Compensation Appeals Board. In the "Further Decision re Judgment" the court ruled that the dismissal constituted a final determination of the right of Liberty to "reimbursement." The

judge based his decision on the policy concerns of "preventing double recovery."

B. *Effect of a finding of employer negligence.*

In *Witt v. Jackson, supra,* 57 Cal.2d 57, the California Supreme Court held that an employer who asserted reimbursement rights in his employee's third party civil action for workers' compensation benefits paid was barred from recovering such if the third party tortfeasor could establish the negligence of the employer as a proximate cause of his employee's injuries. If such a showing were made, the third party tortfeasor was able to reduce the judgment against him by the amount of compensation benefits which up to that time had been paid the plaintiff-employee. (*Id.,* at pp. 72-73.) In *Roe v. Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 884, 890-892 [117 Cal.Rptr. 683, 528 P.2d 1], the *Witt* rationale barring recovery by a negligent employer was extended to a situation where a negligent employer was claiming a credit under Labor Code section 3861.[1]

Post *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], establishing comparative negligence in California, the setoff rights because of the negligence of the employer have been limited to an amount proportionate to the employer's negligence. (*Associated Construction & Engineering Co. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 829, 842 [150 Cal.Rptr. 888, 587 P.2d 684].)

*Witt* spoke only of reimbursement for sums already expended in compensation benefits by the employer, vis-à-vis a setoff from the third party tortfeasor judgment. Later cases have differentiated between compensation paid up to the time of such recovery and benefits payable in the future: "In *Conner v. Utah Constr. & Mining Co.* (1964) 231 Cal.App.2d 263 [41 Cal.Rptr. 728], the Court of Appeal held that *Witt* entitled the third party to a 'set-off' only as to benefits paid—not amounts payable in the future. The court stated that to reduce future benefits would result in an 'unusual and impractical extension' of the

---

[1]Labor Code section 3861 provides: "The appeals board is empowered to and shall allow, as a credit to the employer to be applied against his liability for compensation, such amount of any recovery by the employee for his injury, either by settlement or after judgment, as has not theretofore been applied to the payment of expenses or attorneys' fees, pursuant to the provisions of Sections 3856, 3858, and 3860 of this code, or has not been applied to reimburse the employer."

rule in *Witt v. Jackson.* (*Id.*, p. 275.) *Conner* has been followed in *Slayton* v. *Wright* (1969) 271 Cal.App.2d 219 [76 Cal.Rptr. 494], *Gastelum* v. *City of Torrance* (1969) 2 Cal.App.3d 582 [82 Cal.Rptr. 732], and *Nelsen* v. *Workmen's Comp. App. Bd.* (1970) 11 Cal.App.3d 472 [89 Cal.Rptr. 638]. The *Conner* rule produces an anomaly: where the employee recovers an amount from the third party greater than the compensation benefits already received, and further benefits are to be paid in the future, the employee may receive a double recovery." (*Gilford* v. *State Compensation Ins. Fund* (1974) 41 Cal.App.3d 828, 832 [116 Cal.Rptr. 615].)

The rationale for holding that a third party tortfeasor is not entitled to a setoff or deduction from plaintiffs' judgments for any amount of future workers' compensation benefits payable to such plaintiffs was stated succinctly in *Slayton* v. *Wright, supra*, 271 Cal.App.2d 219, 233: "No sound policy reason exists why the employees should be penalized from receiving the present benefits of a judgment and be required to reduce the amount of their recovery solely by reason of the fact that workmen's compensation is available."

In addition, the California Supreme Court has held that the trial court cannot reduce the jury verdict for workers' compensation benefits where there is no finding of negligence on the part of the plaintiff's employer. (*De Cruz* v. *Reid, supra*, 69 Cal.2d 217, 226.) The facts of *De Cruz* are somewhat similar to the case at bar. Prior to trial the employer in *De Cruz*, as part of a workers' compensation settlement, waived any right to obtain reimbursement from the third party wrongful death action brought by its employee's heirs. The court, in holding that the judgment against the defendant should not be reduced by the amount of the reimbursement rights waived stated: "In the case at bench defendants neither introduced nor offered any evidence therein upon the concurrent negligence of decedent's employer, let alone any evidence that such negligence proximately caused decedent's death. [Citation.] Accordingly, they did not bring themselves within our holding in *Witt* requiring a reduction of the judgment.

" . . . In our view, the compensation benefits of which the nonnegligent employer has waived reimbursement, inure to the benefit of the injured employee or his dependents, as the case may be, as payments received by them from a *collateral source.*" (*Id.*, at p. 223, italics added.)

"To summarize, since in the instant case defendants failed to prove the concurrent negligence of decedent's employer, our decision in *Witt*

did not require that plaintiffs' damages be reduced by the amount of the death benefits received. Since the employer was not negligent, the death benefits paid did not constitute an impermissible double recovery but rather a payment for plaintiff's loss from a source wholly independent of the wrongdoer." (*Id.*, at pp. 226-227.)

The California Supreme Court has also held that where the employer's negligence has not been adjudicated in such third party action, the applicant is entitled to have it adjudicated before the Workers' Compensation Appeals Board. (*Gregory* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 899, 902 [117 Cal.Rptr. 694, 528 P.2d 782], citing *Roe* v. *Workmen's Comp. Appeals Board, supra,* 12 Cal.3d 884.)

As noted above, the Supreme Court in *Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd., supra,* 22 Cal.3d 829, 842, held that a concurrently negligent employer is entitled to application of comparative negligence principles to a credit claim in a board proceeding or reimbursement in a third party action. In so holding the court provided a good summary of the law in this area: "Under section 3601 of the Labor Code, the recovery of workers' compensation benefits is, except in certain limited circumstances, the exclusive remedy of the injured employee against his employer. The claim of those benefits, however, does not affect the employee's right of recovery 'for all damages proximately resulting from such injury or death against any person other than the employer.' (§ 3852; see *De Cruz* v. *Reid* (1968) 69 Cal.2d 217, 222 [70 Cal.Rptr. 550, 444 P.2d 342].) In the event a third party is liable in whole or in part for the employee's injuries, the Labor Code provides the employer with three basic techniques for obtaining reimbursement from the third party for workers' compensation benefits the employer has paid or become obligated to pay: the employer 'may bring an action directly against the third party (§ 3852), join as a party plaintiff or intervene in an action brought by the employee (§ 3853), or allow the employee to prosecute the action himself and subsequently apply for a first lien against the amount of the employee's judgment, less an allowance for litigation expenses and attorney's fees (§ 3856, subd. (b)).' (*Witt* v. *Jackson* (1961) *supra,* 57 Cal.2d 57, 69.) The code also allows an employer to receive credit before the Workers' Compensation Appeals Board towards future workers' compensation liability for the amount of an employee's third party judgment 'as has not theretofore been applied to the payment of expenses or attorneys' fees, pursuant to the provisions of Sections 3856, 3858, and 3860 of this code, or has not

been applied to reimburse the employer.' (§ 3861; see also § 3858.)" (*Id.*, at p. 833, fns. omitted.)

A reading of *Associated Construction, supra, Hodge* v. *Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 501, 511 [176 Cal.Rptr. 675], and *Herr* v. *Workers' Comp. Appeals Bd.* (1979) 98 Cal.App.3d 321, 327 [159 Cal.Rptr. 435], makes it quite clear that the right to a credit in a board proceeding and the right to a lien in a third party action are separate and distinct. In the case at bar, Liberty waived its right to reimbursement from the defendant when it dismissed its complaint in intervention with prejudice. However, the waiver, failure to assert, or settlement of a lien claim in a civil action is not necessarily a settlement or waiver of the credit right. (*Hodge, supra*, at p. 511.) Plaintiff and Liberty in the case at bar are quite correct in their determination that the trial court in this case failed to make a distinction between reimbursement rights and credit rights.

■ The law in this area could be summarized as follows:

1. If an employer is adjudicated concurrently negligent, he is entitled to application of comparative negligence principles to any *credit* or *reimbursement* claims. (*Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd., supra*, 22 Cal.3d 829, 842-843.)

2. The right to a credit or reimbursement are separate and distinct rights and the waiver of a right to reimbursement does not mean that a credit right has been waived. (*Herr* v. *Workers' Comp. Appeals Bd., supra*, 98 Cal.App.3d 321, 327, and *Hodge* v. *Workers' Comp. Appeals Bd., supra*, 123 Cal.App.3d 501, 511.)

3. Where there is no finding of negligence on the part of the employer, the jury verdict cannot be reduced for workers' compensation benefits, these payments being considered received from a collateral source. (*De Cruz* v. *Reid, supra*, 69 Cal.2d 217, 223.)

4. Where a third party tortfeasor is entitled to a setoff because of an employer's concurrent negligence, a reduction in the jury verdict can only be made as to those workers' compensation benefits paid as of the time of trial and not reduced for future workers' compensation benefits. (*Slayton* v. *Wright, supra*, 271 Cal.App.2d 219, 229-233; *Castro* v. *Fowler Equipment* (1965) 233 Cal.App.2d 416, 421-423 [43 Cal.Rptr. 589]; *Conner* v. *Utah Constr. & Mining Co.* (1964) 231 Cal.App.2d

263, 265 [41 Cal.Rptr. 728]. Also the Supreme Court in *Associated Construction, supra,* at p. 389 cites these cases.)

5. Even where the employer's negligence has not been adjudicated in a third party action, an applicant is still entitled to have the employer's negligence adjudicated before the Workers' Compensation Appeals Board. (*Gregory* v. *Workmen's Comp. Appeals Bd., supra,* 12 Cal.3d 899, 902; *Roe* v. *Workmen's Comp. Appeals Bd., supra,* 12 Cal.3d 884, 892.)

C. *Was the employer in this case adjudicated negligent?*

In the instant case, the primary issue comes down to whether, in fact, the employer (Laura Scudders/Pet) was adjudicated negligent. If it were not, then pursuant to *De Cruz, supra,* 69 Cal.2d 217, 223-227, Curtis should not have had his jury verdict reduced for workers' compensation benefits.

There appears to be agreement among the parties in this case that the defendants introduced no evidence of employer negligence. In fact, the judge stated, "The Court recalls no evidence offered or introduced of the employer's concurrent negligence." Indeed, the defendants specifically took the issue of the negligence of the employer away from the jury, and instead decided to rely on the contention that Liberty's dismissal with prejudice of its complaint in intervention was determinative of the issue of Laura Scudders/Pet's negligence. White and State contend that this dismissal in effect means that Laura Scudders/Pet was de facto adjudicated 100 percent negligent on res judicata and collateral estoppel grounds. This contention cannot possibly stand. Liberty's complaint in intervention against the defendants sought reimbursement rights. When it dismissed its complaint in intervention with prejudice, res judicata applied to prevent Liberty from again adjudicating its *reimbursement* rights against the *defendants,* White and State. Clearly res judicata does not apply to any potential *credit* application before the Workers' Compensation Appeals Board—an action involving the employee (Curtis) and the employer (represented here by Liberty, the workers' compensation insurance carrier). As noted above, a waiver of reimbursement rights does *not* mean that the employer has waived any credit rights. (*Herr* v. *Workers' Comp. Appeals Bd., supra,* 98 Cal.App.3d 321, 327, and *Hodge* v. *Workers' Comp. Appeals Bd., supra,* 123 Cal.App.3d 501, 511.)

Defendants' reliance on the doctrine of collateral estoppel is also misplaced. Collateral estoppel is another term for issue preclusion. While under the doctrine of res judicata a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action, under the doctrine of collateral estoppel, the second action is upon a different cause of action and the judgment in the prior suit *precludes relitigation of issues actually litigated and necessary to the outcome of the first action.* (*Parklane Hosiery Co., Inc.* v. *Shore* (1979) 439 U.S. 322, 326, fn. 5 [58 L.Ed.2d 552, 559, 99 S.Ct. 645].) In this case the issue of the employer's negligence was not actually litigated. Hence, the doctrine of collateral estoppel does not come into play.

The whole philosophy behind the doctrine of collateral estoppel is that issues that have already been litigated should not be relitigated. In the instant case, there should be no doubt that the issue of employer negligence was not *actually* litigated because in fact no evidence of such negligence was presented to the jury and indeed the issue of employer negligence was specifically and deliberately taken away from the jury by the defendants.

■ The effect of Liberty's dismissing its complaint in intervention with prejudice operated only to invoke the doctrine of res judicata to bar any further right to reimbursement from the defendants, White and the State. The dismissal did not operate to determine the *issue* of employer negligence. Consequently, as there was no finding of employer negligence in this case, the doctrine of *De Cruz* applies and the judge in this case was only authorized to reduce the jury verdict by the amount of comparative negligence of the plaintiff and the amount of settlement monies received by plaintiff. The issue of the negligence of the employer, if any, is an issue that can be resolved between Curtis and Liberty before the Workers' Compensation Appeals Board in a proceeding to determine the extent of Liberty's credit against Curtis' net recovery from his judgment.

II. *Is plaintiff entitled to interest from the date of the verdict to the date of the judgment?*

Curtis' next major contention on appeal is that he is entitled to interest from the date of the verdict (Jan. 19, 1979) to the date of the judgment (Aug. 23, 1979), in the sum of $57,217.81. Curtis, however,

erroneously cites section 1033 of the Code of Civil Procedure. This section provides in pertinent part that "The clerk or judge shall include in the judgment, or any part of a judgment, entered up by him based upon a *cause of action in contract where the claim was unliquidated,* interest on the verdict or decision of the court from the date prior to the entry of judgment as may have been fixed by the court pursuant to subdivision (b) of Section 3287 of the Civil Code, . . ." (Italics added.) ■ However, this action lies in tort and it is the generally accepted view that interest cannot be awarded on damages for personal injury. (Witkin, Summary of Cal. Law (8th ed., 1980 supp. to vol. 4) Torts, § 881, p. 391.)

As was stated in *Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86, 102-103 [160 Cal.Rptr. 773, 603 P.2d 1329], Civil Code section 3288 permits discretionary prejudgment interest for unliquidated tort claims. The award of such interest represents the accretion of wealth which money or particular property could have produced during a period of loss.

However, damages for the intangible, noneconomic aspects of mental and emotional injury are not readily subject to precise calculation and the amount of such damages is necessarily left to the subjective discretion of the trier of fact. (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra,* 26 Cal.3d 86, 103.)[2]

Even if Curtis' claim had been meritorious, respondent White points out that plaintiff's failure to pursue any claim for interest in the trial court necessarily precludes consideration of this issue on appeal. The record indicates that indeed plaintiff did not pursue any claim for interest in the trial court below. Hence, consideration of plaintiff's claim cannot be heard on appeal. (*Straughter* v. *State of California* (1980) 108 Cal.App.3d 412, 415 [169 Cal.Rptr. 471]; see generally, 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 284, p. 4272.)

---

[2]Interest is recoverable under Civil Code section 3287, subdivision (a), in tort actions for damages for loss of real and personal property, where the damages are readily ascertainable. Interest is also recoverable to compensate a party for the loss of his or her *property* pursuant to Civil Code section 3288, which provides that "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra,* 26 Cal.3d 86, 102; Witkin, Summary of Cal. Law (8th ed., 1980 supp. to vol. 4) Torts, § 881, p. 391.)

III. *Did the jury's special verdict finding preclude defendant White's liability based on either a negligence or strict liability theory.*

At the conclusion of the trial in the instant case, the jury was instructed on theories of products liability, negligence, and strict liability. The jury was given a set of interrogatories to answer as a special verdict. Issues 6 to 11 of the special verdict pertained to the liability of defendant White.

White's contention on cross-appeal flows from the fact that although the jury was properly instructed on both alternative tests for determining whether a product is defective for strict liability purposes pursuant to *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, one of the tests was omitted from the special jury verdict form. ■ The tests in *Barker* were enunciated as follows: "[A] product may be found defective in design, so as to subject the manufacturer to strict liability for resulting injuries, under either of two alternative tests. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id.,* at p. 432.)

To issues 6 and 7 of the special verdict the jury responded that White was negligent and that this negligence was a proximate cause of the injury and damage to the plaintiff. Issues 8 through 11 related to the strict liability causes of action. In response to issues 8 and 9, the jury replied that there *was* a defect in the design of the product in question and that this was a proximate cause of plaintiff's injuries. To issue 10 the jury responded that the product in question was used in a manner reasonably foreseeable by White. Issue 11 asked the following question, satisfying one prong of the *Barker* test, *supra*: "Did the benefits of the design of the product as a whole outweigh the risk of danger inherent in such design?" The jury responded, "yes" to this question. However, there was *no* corresponding question asking for a response to the other test of *Barker*—i.e., did the product perform as safely as an ordinary consumer of the product would expect? As mentioned previously, the jury was properly instructed on *both* prongs of the *Barker* test. Consequently White is incorrect when it states, "The alternative test

concerning consumer safety expectations was not even submitted to a jury." Rather, while it is true that this alternative test was not submitted to the jury in the form of a special verdict interrogatory, it was indeed submitted to the jury in the form of a special jury instruction.

It is White's contention on appeal that the answer to the special interrogatory on issue 11 is equivalent to establishing that the product contained no actionable defect on either a strict liability or a negligence theory.

White's major contention with regard to the strict liability cause of action is that since under *Barker* a product may be defective under one of two theories and the jury rejected one and was not permitted the opportunity to find one way or the other on the other theory, this "conclusively" shows that the product was not defective.

Plaintiff Curtis argues that since the jury was given both prongs of the *Barker* test for strict liability, the jury was able to consider the consumer expectation theory, and in any event, he also proceeded on the negligence theory, which was entitled to separate consideration. On appeal, Curtis pointed to the evidence which supported the negligence verdict, especially on a "failure to test" theory. However, in response to these contentions respondent White stated that Curtis' "mischaracterization of this cross appeal as a challenge to the sufficiency of the evidence is a blatant attempt to mislead this court .... Clearly White's position in no way constitutes a challenge to the sufficiency of the evidence supporting the jury's verdict."

It is White's contention that the jury's special finding that the benefits of the design of the defendant's product outweighed the risks must prevail over a general conclusionary verdict. White cites Code of Civil Procedure section 625, which states in pertinent part: "Where a special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court must give judgment accordingly."

White's contention is that the response to issue 6 on the special verdict form that White was negligent must be "regarded" as a general verdict because such a finding is "necessarily a pronouncement generally upon all or any of the issues." The verdict in this case, however, was clearly a special verdict and not a general verdict coupled with special interrogatories or findings.

Code of Civil Procedure section 624 distinguishes between a special and a general verdict as follows: "... A general verdict is that by which they pronounce generally upon all or any of the issues ...; a special verdict is that by which a jury finds the facts only, leaving the judgment to the Court ...."

Applying White's theory by analogy to the situation where there indeed has been a general verdict with inconsistent special findings, we find that his theory still fails. It has been stated: "The appellate courts have frowned on attempts to upset general verdicts by finding technical inconsistencies, and have been astute in the discovery of theories to resolve the conflict. The governing principle is stated in *Law* v. *Northern Assur. Co.* (1913) 165 C. 394, 406, 132 P. 590, quoting Cyc.: 'No presumption will be indulged in favor of answers of the jury to special interrogatories as against the general verdict; but, on the contrary, every reasonable intendment in favor of the general verdict should be indulged, and all parts of the verdict are to be reconciled in support thereof if it can reasonably be done. Hence, the general verdict will stand unless the facts found by the jury in answer to special interrogatories are so clearly antagonistic to it as to be absolutely irreconcilable, the conflict being such as to be beyond the possibility of being removed by any evidence admissible under the issues, so that both the general verdict and special findings cannot stand.' (See also *Lowen* v. *Finnila* (1940) 15 C.2d 502, 102 P.2d 520; *Hudgins* v. *Standard Oil Co.* (1933) 136 C.A. 44, 51, 28 P.2d 433; *Tremble* v. *Tuman* (1917) 175 C. 696, 167 P. 142; 1969/70 A.S. 512 [Fed. Rule].)

"In *Hudgins* v. *Standard Oil Co., supra,* plaintiff sued for personal injuries. One of the defenses was a release of claims, and genuineness and due execution were denied by plaintiff. The general verdict was for plaintiff, and the special findings were that plaintiff executed and delivered a certain instrument of release, that defendants made no misrepresentations concerning it, and that defendants did nothing to prevent plaintiff from acquiring full understanding thereof before signing. *Held,* there was no fatal inconsistency. The special findings eliminated any element of fraud or sharp practice, but no interrogatory was submitted on the issue of *mistake,* and it was presumed in support of the general verdict that the jury found for the plaintiff on the ground that the release was executed by mistake.

"The same underlying principle—that special findings cannot be controlling unless they are irreconcilable with the general verdict—results

in the rule that *inconsistent special findings* do not affect the verdict. 'Special verdicts cannot control a general verdict unless consistent with each other .... They cannot destroy the general verdict, if at all, except by their own inherent strength and clearness.' (*Koskela* v. *Albion Lumber Co.* (1914) 25 C.A. 12, 27, 142 P. 851.)" (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 280, p. 3086.)

There are two flaws to White's contentions. The first is White's assumption that the jury's finding on issue 11 conclusively means that there could be no actionable defect as the jury so found. In this case the jury was instructed on the consumer expectation prong of *Barker*; therefore they could have found the defect on that basis. The second flaw is that the finding on issue 11 automatically precluded recovery on a negligence theory, for it has been held that a party has a right to independent jury consideration of strict liability and negligence theories in a products liability action. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].) The facts in *Hasson* are somewhat similar to the case at bar. *Hasson* involved allegations that plaintiff's injuries were caused by a brake failure resulting from a heat-induced vaporization of the brake fluid of a vehicle. Causes of action in both strict liability and negligence were alleged against the defendants. The jury found against all defendants in a general verdict, but made special findings that there had been *no* defect in the vehicle at the time it was manufactured in Seoul, but that the defendants *had been negligent.* The defendants alleged that there was an inconsistency between the jury's finding of "no defect" and the finding of negligence, and that there was an inconsistency between the finding of "no negligence" and the general verdict. Defendants contended that this invoked Code of Civil Procedure section 625 which provides that the special finding should control the verdict. In holding that the jury's "no defect" finding was *not* fatally inconsistent with the general verdict, the court repeated the well-settled principles of law so aptly stated in the above quote from Witkin and then stated, "A finding of inconsistent verdicts in this case would ignore the jury's express finding of negligence, and would render superfluous a legal theory submitted to the jury without objection of either party." (*Hasson, supra*, at p. 544.)

■ To summarize, as the jury in this case was specially instructed on the consumer expectation prong as required by *Barker*, we cannot now hold that their determination that the product here involved was defective was erroneous merely because they found that the benefits of

the design of defendant's product outweighed the risks. The jury very well could have found the product defective on the consumer expectation prong, thereby finding White liable on a strict liability theory. Furthermore, even if we assumed that the answer to issue 11 negated the jury's finding of a defect, that does not eliminate finding White liable on a negligence theory, as the parties here involved had the right to have the jury independently consider both theories. As stated above, *Hasson* holds that the finding of "no defect" does not necessarily preclude a finding of negligence. In addition, White concedes that its contention "in no way constitutes a challenge to the sufficiency of the evidence supporting the jury's verdict." Hence, White's challenge on its cross-appeal cannot stand.

IV. *Was there substantial evidence to support the verdict against defendant State of California?*

■ On cross-appeal the State of California challenges the sufficiency of the evidence to support the jury's verdict against it.

Plaintiff in this case sought to find the State liable under the theory of dangerous condition of public property. Government Code section 830, subdivision (a), defines a dangerous condition as follows: "As used in this chapter:

"(a) 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

Government Code section 835 further provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Actual and constructive notice are set forth in Government Code section 835.2.[3]

The jury in this case was properly instructed pursuant to the above statutes and found by special verdict that (1) the public property in question was in a dangerous condition at the time of the accident, (2) this condition was a proximate cause of injury to the plaintiff, (3) the injury occurred in a way which was reasonably foreseeable, (4) the condition was created by a negligent or wrongful act or omission of an employee of the State, and (5) the State had actual or constructive notice of the dangerous condition.

The State contends that the presence of the cow on the highway did not constitute a dangerous condition because "the mere presence of a cow on the roadway does not create a substantial risk of harm when a driver is exercising due care" and in this case the jury found plaintiff 15 percent negligent. The State argues that "Mr. Curtis did not have to contend with a moving object, he merely had to avoid a stationary one." It appears to be assuming that the dangerous condition Curtis is alleging was merely the presence of the cow on the highway. Rather, the theory upon which Curtis sought recovery against the State is that its *property*, the state fence, was improperly constructed and maintained when staples were put up on the wrong side of the fenceposts, thereby making it easier for cows to push out the staples, such that it created a dangerous condition to the public, i.e., it was foreseeable that a cow entering a public highway would create a substantial risk of harm.

Numerous witnesses in this case testified that the position of the staples on the freeway side of the fence created a hazard; in fact, the

---

[3]"(a) A public entity had actual notice of a dangerous condition within the meaning of subdivision (b) of Section 835 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character.

"(b) A public entity had constructive notice of a dangerous condition within the meaning of subdivision (b) of Section 835 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character...."

resident construction engineer for the portion of Interstate 5 in question which included the state fence, testified that he did not consult the maintenance superintendent for determination of which side to place the wire as recommended by the applicable construction manual. The State-hired independent consulting expert testified that the best way to prevent livestock animals from getting out would be to staple the wire on the side of the post closest to the pasture. The highway maintenance supervisor for the State Department of Transportation also testified that it would have been better to place the wire on the animal side of the fence in terms of keeping livestock off the freeway.

In order to recover under Government Code section 835, it is not necessary for plaintiff to prove a negligent act *and* notice; either negligence *or* notice will suffice. However, the State also contends that it had no notice of the cow on the highway or the hole in the state fence.

The State then recites the facts to show that indeed the State had no actual notice "of the cow being on the roadway" in such a time to be able to ameliorate the hazard and that the hole in the fence was not actually discovered until six days after the accident. The State neglects to consider that notice as required by Government Code section 835.2, subdivision (b), also includes constructive notice, which may be established "if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." Such is the theory that the plaintiff here relied on.

The substantial evidence presented at trial that the placement of the staples on the wrong side of the fence creating a hazardous condition is enough to support the conclusion that the State "should have discovered the condition and its dangerous character." It was further supported by the highway maintenance supervisor, who testified that there was an economical way to string wire around the post to provide better protection against the cows getting out onto the freeway.

The State contends that "the crucial issue is whether or not the hole Alfred Mays observed was there at the time of the accident. The uncontradicted evidence is that it was not there." The day after the accident Raymond Lopez, the owner of the cow involved in this accident, went to the scene of the accident. At this time he did *not* see the fence opening that is the subject of this suit. The insurance investigator for Lopez,

John Cardoni, went to the scene three days after the accident, and he observed no hole in the state fence. However, six days after the accident, Alfred Mays, a research engineer and the owner of the property where the fence was located, discovered a hole in the fence. The top part of the hog wire was knocked loose and one of the strands was loose from the post. He also observed what he determined to be heifer tracks leading from the damaged fence to the highway. Pictures were taken and shown to the jury. After describing the damaged fence in detail, a State-hired consulting expert testified that an animal could pass through this opening. In fact, the state conceded in a request for admission that the opening was of a size sufficient that a heifer could have walked under the wire. White contends that Mays, Lopez and Cardoni all had an interest in finding a hole or defect in the state fence, seeking to discredit their testimony of subsequently finding the hole in the fence. However, the jury was given evidence to explain why the hole in the fence might not have been discovered upon first examination of Lopez and Cardoni. The record is unclear how close Lopez approached when he inspected the fence the first time. The first time Cardoni went to the area, he remained for only half an hour to 45 minutes and he testified that he did not "recall looking at the fence that closely that first day." Consequently the State's assertion that it is uncontradicted that there was no hole in the state fence for three days after the accident is in error. A legitimate conclusion is that the hole was not yet discovered during this period.

The State also contends that there was no evidence to indicate that a cow created the hole by pushing the staples; hence there was no proximate cause. It is true there was no eye witness testimony to the fact that this cow created the hole in question. Such eye witness testimony, however, is rare indeed. However, the jury in this case was provided with evidence in which it could reasonably infer that the cow in question pushed out the fence, escaped through the hole, and entered the highway, thus causing the accident. ■ The appellate court is required to give the prevailing party the benefit of *every reasonable inference.* It has been stated: "*Where the evidence is in conflict, the appellate court will not disturb the verdict of the jury or the findings of the trial court.* The presumption being in favor of the judgment (see *supra,* § 235), the court must consider the evidence in the light *most favorable to the prevailing party,* giving him the benefit of *every reasonable inference,* and *resolving conflicts* in support of the judgment." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, p. 4236.)

Accordingly, the State's challenge to the sufficiency of the evidence cannot stand.

The judgment is reversed and the trial court is ordered to enter the proper judgment in the amount of $1,381,250 plus costs.

Brown (G. A.), P. J., and Zenovich, J., concurred.

A petition for a rehearing was denied March 10, 1982, and the opinion was modified to read as printed above. The petitions of defendants and appellants for a hearing by the Supreme Court were denied April 21, 1982.