Filed 7/20/16  San Diego Assn of Governments v. Vanta CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO ASSOCIATION OF GOVERNMENTS, | D065476, D066560 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00101950-CU-EI-CTL) |
| RAMON S. VANTA, | |
| Defendant and Appellant. | |

CONSOLIDATED APPEALS from a judgment and postjudgment order of the Superior Court of San Diego County, Randa Trapp, Judge.  Judgment affirmed; postjudgment order reversed.

The Affinity Law Group and Gregory P. Goonan for Defendant and Appellant.

Best, Best & Krieger and Bruce W. Beach for Plaintiff and Appellant.

In this eminent domain case involving partial condemnation of defendant Ramon S. Vanta's land, Vanta and plaintiff San Diego Association of Governments (SANDAG) both appeal from the judgment on a jury verdict awarding Vanta compensation for the

land taken and a postjudgment order on Vanta's motion for attorney fees. Vanta contends the trial court prejudicially erred by (1) granting SANDAG's motion in limine to prohibit him from presenting evidence of the increased cost to develop access to his remaining land as part of his severance damages; (2) refusing to give his proffered special jury instruction regarding the calculation of severance damages in an impaired access case; and (3) not including in his attorney fee award the contingent fee portion of the attorney fees he paid. SANDAG contends (1) the court should have excluded the testimony of Vanta's valuation expert based on Vanta's failure to properly exchange valuation data; (2) the court should not have awarded Vanta any attorney fees; and (3) Vanta's actions throughout the case prejudiced SANDAG. We affirm the judgment and reverse the postjudgment order awarding Vanta attorney fees.

FACTUAL AND PROCEDURAL BACKGROUND

SANDAG filed a complaint in eminent domain on August 7, 2012, to acquire a portion of Vanta's property located on East Beyer Boulevard in San Ysidro (the property) for the San Ysidro Rail Yard Improvement Project (the project). In October 2012, Vanta filed an answer to the complaint and the parties stipulated to his withdrawal of probable compensation in the amount of $781,000 that SANDAG had deposited. The court issued an order for possession authorizing SANDAG to take possession of the condemned property in November 2012.

The condemned property consists of approximately 4.92 acres of a 21.93 acre parcel owned by Vanta, leaving approximately 17.01 acres as his remaining property after the take. Because the area SANDAG acquired from Vanta included all of the

2

parcels that provided legal and physical access to his remaining property from East Beyer Boulevard, the adjoining road, SANDAG restored access to East Beyer Boulevard by acquiring an ingress-egress easement (the replacement easement) over adjoining property to the northwest owned by Charles Pipitone. The replacement easement crossed unimproved land and was not developed into a passable road. Constructing a road on the replacement easement was not included in the project for which SANDAG acquired Vanta's property.

At a case management conference (CMC) in April 2013, the court set trial for September 27, 2013, and ordered a first expert witness exchange to be completed by July 5, 2013, and a second expert witness exchange to be completed by July 19, 2013. SANDAG served a list of experts and a statement of valuation data under Code of Civil Procedure section 1258.260[1] on July 3, 2013. Vanta served an initial expert witness designation on July 5, 2013, that stated the designation was in accordance with section 2034.210, which provides for the exchange of expert witness information in civil actions generally but not in eminent domain proceedings.[2] Vanta served a second expert designation "in accordance to Section 2034.280" on July 19, 2013. Vanta did not serve any valuation data with either of his expert witness designations.

---

[1]    All further statutory references are to the Code of Civil Procedure unless otherwise noted.

[2]    Section 2034.010 states: "This chapter does not apply to exchanges of lists of experts and valuation data in eminent domain proceedings under Chapter 7 (commencing with Section 1258.010) of Title 7 of Part 3."

SANDAG filed written objections to both of Vanta's expert witness designations on the ground the exchanges failed to comply with sections 1258.250 and 1258.260, which govern the statements of valuation data that are required to be exchanged for each expert witnesses a party in an eminent proceeding intends to call to testify on valuation and just compensation issues. Vanta did not respond to SANDAG's objections.

Before trial, Vanta served on SANDAG his final demand for just compensation and SANDAG served on Vanta its final offer of compensation under section 1250.410. Vanta demanded $3,250,000 and SANDAG initially offered $687,830. SANDAG later served an amended offer in the amount of $805,800. SANDAG's offer was "inclusive of interest, costs of suit . . . , and attorneys' fees and litigation expenses." Vanta's demand stated it did "not include, and specifically exclude[d], payment for attorneys' fees, costs, litigation expenses, or interest."

At the beginning of trial, the court ruled on the parties' motions in limine, two of which are at issue in this appeal. The court denied SANDAG's motion in limine to exclude the expert opinions of Vanta's designated valuation expert Gerry Van Tassel on the ground Vanta failed to exchange valuation data with his expert witness designation as required under sections 1258.250 and 1258.260. The court granted SANDAG's motion in limine to exclude Vanta's evidence of the "cost to cure"–i.e., the cost to construct a road over the replacement easement ($915,960), which Vanta intended to add to his figure for

4

the diminution in value of his remaining property ($886,594) to arrive at $1,802,554 as the total amount of his severance damages.[3]

The case was tried to a jury, which returned a special verdict finding the fair market value of the property taken as of August 7, 2012, was $676,049.20, and the amount of severance damages was $765,046. The court entered judgment consistent with the jury's verdict, awarding Vanta compensation in the total amount of $1,441,095.20. The court granted Vanta's postjudgment motion for attorney fees as litigation expenses under section 1250.410 and awarded him attorney fees in the amount of $122,650 and expert fees in the amount of $61,007.34.

We will include additional relevant facts in our discussion of the legal issues.

DISCUSSION

*VANTA'S APPEAL*

I. *Exclusion of Evidence of the Cost to Develop Access to the Remaining Property as Severance Damages*

Vanta contends the trial court prejudicially erred by granting SANDAG's motion in limine to prohibit him from presenting evidence of the increased cost to develop access to his remaining land as part of his severance damages.

"'[A]n appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion.' [Citation.]" (*Dart Industries*, *Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078; *Boston v. Penny Lane Centers*, *Inc.* (2009)

---

[3] Van Tassel's estimate of total severance damages was $1,802,554 at one point in his written appraisal, and was $1,807,400 at the conclusion of the appraisal.

170 Cal.App.4th 936, 950.) "The court's exercise of discretion will be upheld on appeal unless a clear error of law or manifest abuse of discretion is demonstrated." (*Michail v. Fluor Mining & Metals*, *Inc.* (1986) 180 Cal.App.3d 284, 286-287.) If the exclusion of evidence is proper on any theory, it must be sustained regardless of the particular considerations that motivated the trial court to exclude it. (*Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 173.) Further, a judgment will not be reversed for erroneous admission or exclusion of evidence unless the reviewing court concludes it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (Evid. Code, §§ 353, 354; *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 334-335; *Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 692.)

Vanta argues the exclusion of his evidence of the increased cost to develop access to his remaining land was an error of law because he was entitled to recover both the diminution in value of his remaining land after the taking and the increased cost to develop an access road to the remainder over the cost to develop access to the land in its condition before the taking as severance damages. We conclude the court properly excluded evidence of the cost to build a road over the replacement easement.

By statute, the owner of private property taken by eminent domain is entitled to just compensation in the amount of the fair market value property taken. (§§ 1263.010, 1263.310.) "When the property taken is part of a larger parcel, in addition to being compensated for the part taken, the owner is compensated for the injury, if any, to the remainder. (§ 1263.410, subd. (a).) Compensation for injury to the remainder is the

6

amount of the damage to the remainder, or severance damages, reduced by the amount of benefit to the remainder. (§ 1263.410, subd. (b).)" (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 698 (*Continental*).) "Severance damages are not limited to special and direct damages, but can be based on any factor, resulting from the project, that causes a decline in the fair market value of the property." (*Id.* at p. 712.) "[I]n determining a landowner's entitlement to severance damages, the fact finder . . . shall consider competent evidence relevant to any conditions caused by the project that affect the remainder property's fair market value, insofar as such evidence is neither conjectural nor speculative." (*Id.* at p. 718, fn. omitted; *City of Livermore v. Baca* (2012) 205 Cal.App.4th 1460, 1466 (*Livermore*) [Severance damages "may not be based on ' " 'speculative, remote, imaginary, contingent, or merely possible' " ' events."].)

As noted, the trial court granted SANDAG's motion in limine to exclude evidence of the cost ($915,960) to construct a road to Vanta's remaining property in the after condition, which evidence SANDAG referred to as "cost to cure" evidence. The Court of Appeal in *People ex rel. Department of Public Works v. Hayward Bldg. Materials Co.* (1963) 213 Cal.App.2d 457 (*Hayward*) explained that there are two classes of evidence of severance damages. The first is evidence of the diminution in value of the landowner's remaining property as a result of the condemnation and public work; the second is " 'cost to cure' " evidence–i.e., " '[e]vidence of the cost of restoring the injured property to the same relative position to the public work in which it stood before its construction.' " (*Id.* at p. 465.)

7

Because the measure of severance damages is the decrease in the market value of the remaining property, if the cost of restoring the remaining property as far as possible to its position before the taking is less than the increase in the market value the restoration would bring to the property, the condemner is entitled to adopt the restoration cost (cost to cure) as the measure of severance damages if it is less than the decrease in the unrestored property's market value as a result of the taking. (*Hayward*, *supra*, 213 Cal.App.2d at pp. 465-466.) Consequently, when the property owner offers evidence of the cost to cure, the evidence is " 'admissible only when there is also evidence that such cost is no greater in amount than the decrease in market value of the property if it is left as it stood.' " (*Id.* at p. 466.) Conversely, when the owner relies on evidence of the decrease in the market value of the property as it is left by the taking, the condemner is entitled to present evidence of the cost to cure if that measure of severance damages would result in a lesser award than the diminution in market value. (*Ibid.*)

In short, the cost to cure is a proper measure of severance damages "only when it is no greater in amount than the decrease in the market value of the property if left as it stood." (*People ex rel. Department of Public Works v. Flintkote Co.* (1968) 264 Cal.App.2d 97, 106.) Accordingly, Vanta was not entitled to recover both the diminution in the market value of his remaining property and the cost of "curing" his loss of direct access to the property by developing access to the property over the replacement easement; he was entitled to recover one or the other, whichever was less, and was not entitled to present cost to cure evidence in the absence of evidence that the cost to cure

8

was not greater than the decrease in the remaining property's market value. (*Hayward*, *supra*, 213 Cal.App.2d at p. 466.)

In his reply brief, Vanta asserts that the road construction costs he sought to present to the jury do not constitute "cost to cure" evidence and that he is not arguing that the cost to cure is an additional element of severance damages or should be used as a substitute for the calculation of fair market value. He explains that his argument is that the cost of constructing a road over the replacement easement should have been admitted as evidence of the fair market value of the remaining property–i.e., as evidence that the fair market value of the remainder was further reduced by the increased cost of constructing the road.

Vanta's characterization of his argument as not seeking the cost to cure as an additional element of severance damages is inaccurate.[4] Vanta is plainly arguing that he has the right to recover the increased cost of building a road over the replacement easement to "cure" the loss of direct access to his property in the before condition as an element of his severance damages. Although he characterizes this cost to cure as a dollar-for-dollar reduction in the property's fair market value, it effectively constitutes an

---

[4]     To argue that severance damages in the amount of the cost of constructing a road over the replacement easement would not constitute "cost to cure" damages is quibbling over semantics. Vanta's valuation expert Van Tassel referred to the cost of constructing an access road over the replacement easement as "Cost to Cure." Vanta in his opening brief argues that real estate appraisers in calculating the fair market value of a property with a deficiency "will factor in the *cost to cure* the deficiency." (Italics added.) He also cites *Olson v. Shasta* (1970) 5 Cal.App.3d 336, 342 for the proposition that, in his words, "damages to cure problems caused by the taking is not a separate, unrelated measurement of damages but merely evidence of loss of market value."

9

additional element of severance damages over and above the reduction in fair market value he contends the property suffered as a result of his loss of the right to directly access his property and his exclusive control of such direct access.

In any event, regardless of whether evidence of the cost to build a road over the replacement easement is properly viewed as "cost to cure" evidence, the court's exclusion of that evidence was not an abuse of discretion for the additional reason that the evidence was speculative and conjectural evidence of a specific plan of future access development that did not presently exist and might never exist. As noted, severance damages "may not be based on ' " 'speculative, remote, imaginary, contingent, or merely possible' " ' events." (*Livermore*, *supra*, 205 Cal.App.4th at p. 1466) In the same vein, "[a] condemnation award cannot be based upon a speculative projected use for the property claimed by the owner. (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1146 (*Zuckerman*).)

The Court of Appeal in *Zuckerman* reversed an award of severance damages that was based on evidence that in the event "wildcat" (exploratory) wells would be drilled in the future to explore the earth beneath a condemned oil and gas storage reservoir, they would have to be "slant drilled" from outside the condemned property at a greater cost than if they could be drilled from straight above the condemned reservoir. (*Zuckerman*, *supra*, 189 Cal.App.3d at pp. 1145-1146.) The *Zuckerman* court concluded that the severance damage award was conjectural because, among other reasons, there was no evidence that any future oil and gas exploration would occur in the remainder property (mineral rights) beneath the condemned reservoir. (*Id.* at p. 1146.) Similarly, the court in

10

the present case properly excluded evidence of the increased cost of building an access road to Vanta's remaining property over the replacement easement because there was no evidence of any plan to develop legal access to Vanta's property in the before condition.[5] Vanta did not lose existing legal access; he lost only the *potential* to construct legal access across the condemned parcels due to the taking.[6]

Regarding severance damages for loss of potential access, one court noted, "A plaintiff in a takings case cannot recover damages for lost potential access unless the plaintiff establishes that there was a reasonable probability that access would have been provided in the before taking scenario in the reasonably near future." (*Childers v. United States* (Fed.Cl. 2013) 116 Fed.Cl. 486, 553, citing *United States ex rel. TVA v. Powelson* (1943) 319 U.S. 266, 275-276 [Special or higher use of land is too remote and speculative to be considered for purposes of compensation in an eminent domain case absent a showing of a reasonable probability that the land will be developed for such use in the reasonably near future.] and *Board of County Supervisors v. United States* (Fed.Cir. 2002) 276 F.3d 1359, 1365 [To establish the highest and best use of the property, a party must show a "reasonable probability that, at the time of the taking, the land was both physically adaptable for such use and that there was a need or demand for such use in the

---

5     The record shows that Vanta had access to his property in the before condition over a rough graded dirt road, but the access was not legal access because a portion of the road ran outside of Vanta's property such that he would trespass on adjoining property by using the road. The court granted a motion in limine by SANDAG to exclude testimony regarding access to Vanta's property in the before condition over the dirt road.

6     Vanta's valuation expert Van Tassel testified that Vanta did not have any permits or approvals or a specific development plan for his property–"just concepts."

reasonably near future."].) Here, the evidence did not show a reasonable probability that Vanta would have developed access to his property in the before condition in the reasonably near future, or that the property itself would have been developed for any particular use in the reasonably near future. Consequently, Vanta was not entitled to compensation for the cost of building a road over the replacement easement that might never be built; he was entitled only to the reduction in the fair market value of the remainder as it was left by the taking. The court did not abuse its discretion in excluding evidence of the cost to develop access to Vanta's remaining land as part of his severance damages.

II. *Refused Special Instruction Regarding the Calculation of Severance Damages for Impaired Access*

Vanta contends the court prejudicially erred by refusing to give the special jury instruction he proffered regarding the calculation of severance damages in an impaired access case. Vanta requested and the court refused the following instruction designated "Defendant's Proposed Instruction No. 1": "Mr. Vanta had a right of access, or a right to go to and from his property, over the land taken by the plaintiff. [¶] You must determine whether Mr. Vanta's access to the property he still owns after the taking was lost or impaired by the taking and, if so, whether the fair market value of Mr. Vanta's remaining property has been decreased by reason of any loss or impairment of access you may find. This should be considered in determining the amount of severance damages, if any."

"A party is entitled to an instruction on each viable legal theory supported by the pleadings and substantial evidence if the party requests a proper instruction. [Citations.]

12

'A court may refuse a proposed instruction that incorrectly states the law or is argumentative, misleading, or incomprehensible to the average juror, and ordinarily has no duty to modify a proposed instruction. [Citations.] A court may refuse a proposed instruction if other instructions given adequately cover the legal point. [Citations.]' [Citation.] Because an appealed judgment is presumed correct and an appellant has the burden to show error, we cannot conclude that the refusal to give an instruction was error absent an adequate showing that the proposed instruction was proper." (*Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 80.)

"The giving of an instruction argumentative in form is error [citations], although it is not always cause for reversal. [Citations.] An instruction that goes too elaborately into the particular facts relied on by one of the parties is an argumentative instruction. An instruction should state rules of law generally, rather than elaborate matters of evidence. [Citation.] Any attempt to stress, over emphasize, or unduly make prominent selected portions of the evidence is in violation of the rule that instructions should not focus the jury's attention on particular items of evidence; '[The] vice in any such instruction is that it unduly emphasizes one portion of the evidence, puts the court in the position of making an argument to the jury, and misleads the jury into thinking that because the court has specifically mentioned certain testimonial facts they are of undue importance or that the court believed them to be true.' [Citation.]" (*Slayton v. Wright* (1969) 271 Cal.App.2d 219, 238.)

We conclude that the court correctly refused to give Vanta's proffered instruction regarding impairment of access because the instruction was legally incorrect. Under

13

California law, a landowner possesses an easement of access to "the street upon which the landowner's property abuts and from there, in a reasonable manner, to the general system of public streets." (*Breidert v. Southern Pac. Co.* (1964) 61 Cal.2d 659, 663 (*Breidert*).) However, "[n]ot every interference with the property owner's access to the street upon which his property abuts and not every impairment of access, as such, to the general system of public streets constitutes a taking which entitles him to compensation. Such compensation must rest upon the property owner's showing of a *substantial impairment* of his right of access to the general system of public streets." (*Id.* at pp. 663-664.)

The trial court determines as a question of law whether the interference with the property owner's access constitutes a substantial or unreasonable impairment. (*Breidert*, *supra*, 61 Cal.2d at p. 664.) If the court determines there is substantial impairment, the jury determines the extent of the impairment. (*Ibid.*) "Substantial impairment cannot be fixed by abstract definition; it must be found in each case upon the basis of the factual situation. . . . '[E]ach case must be considered upon its own facts.' " (*Id.* at pp. 664-665, fns. omitted.) In determining whether there is a substantial impairment of a property owner's access to the general system of public streets and public highways, the essential inquiry is whether the taking has *unreasonably* interfered with the property owner's right of access. (*People ex rel. Department of Public Works. v. Romano* (1971) 18 Cal.App.3d 63, 72-73.)

"[T]he trial court is required to compare the access available to the particular property before and after the impairment and then decide if the impairment is substantial.

14

This determination requires the consideration of extensive evidence of the effect of the impairment of access to the property which existed before the impairment. Although many appellate courts have stated they are treating the issue of substantial access impairment as one of law, it appears that if there is an impairment of access to the abutting street and from there to the general system of public streets the trial court findings of 'substantial' impairment have been reviewed using a substantial evidence test. . . . Because of the factual nature of the inquiry, which is unique to each property, we view the trial court's determination of 'substantial' impairment as a determination to be sustained if it is supported by substantial evidence. [Citations.] The characterization of the issue of substantial impairment as one of law means only that the compensability issue is a court issue and not a jury issue; the jury issue is limited to the amount of damages." (*San Diego Metropolitan Transit Development Bd. v. Price Co.* (1995) 37 Cal.App.4th 1541, 1547-1548 (*Price*), fn. omitted.)

In contravention of this authority, Vanta's rejected jury instruction asked the *jury* to determine whether Vanta's access to his remaining property "was lost or impaired by the taking" and whether any loss or impairment the jury might find decreased the property's fair market value—i.e., was compensable. Thus, the instruction effectively would have called upon the jury rather than the court to decide the legal question of whether SANDAG's taking substantially impaired Vanta's access to his remaining property. Whether the taking substantially impaired Vanta's access such that it was

15

compensable was a question for the court to decide.[7]  The only proper question for the jury to decide regarding impairment of access would have been the extent of the impairment—i.e., the amount of damages–had the court found substantial impairment.[8]  Thus, the court properly rejected Vanta's proffered instruction because it was legally incorrect.

We conclude the record supports an implied finding that SANDAG's taking did not substantially impair Vanta's access.  "The doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment.  [Citation.]  The doctrine is a natural and logical corollary to three fundamental principles of appellate review:  (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the

---

[7]     At trial, Vanta's counsel acknowledged the rule that the court rather than the jury decides whether a taking substantially impairs access but requested the instruction anyway.  After close of evidence and during reported discussion of proposed jury instructions, Vanta's counsel stated that "normally with this instruction, the Court would make a finding . . . as to whether or not there was substantial access.  But . . . because this is a mixed question, the jury will make the finding.  So I still believe it's appropriate to instruct them that if you find that there has been substantial impairment of access, that could be a factor that may be considered in severance damages."

[8]     Vanta states that the source of his proffered special instruction is BAJI No. 11.87, which instructs the jury to determine the extent of severance damages caused by impairment of access.  However, BAJI No. 11.87 applies only *after the court has determined there is substantial impairment of access*, stating, in relevant part:  "The court has determined that defendant's right of access [has been] [will be] impaired by reason of plaintiff's [proposed] acquisition and the construction of the improvement thereon [in the manner proposed].  You must determine the extent, if any, to which defendant's remaining property has been decreased in market value by reason of this impairment of access.  This should be considered in determining the amount of severance damages, if any."

16

burden of providing an adequate record affirmatively proving error." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

SANDAG filed written opposition to Vanta's proffered instruction in which it cited the rule that only substantial impairment of access is compensable and argued there was no evidence of substantial impairment. The trial court orally ruled that "[SANDAG's] objection to proposed instruction No. 1 is sustained. I will not give [Vanta's] proposed special instruction No. 1." The court's rejection of Vanta's proffered instruction and sustaining of SANDAG's objection to the instruction on the ground there was no evidence of substantial impairment of access constitutes an implied finding that the taking did not substantially impair Vanta's access to his remaining property. Substantial evidence supports that finding.

As noted, "[t]he right of access is not unlimited. 'Not every interference with the property owner's access to the street upon which his property abuts and not every impairment of access, as such, to the general system of public streets constitutes a taking which entitles him to compensation.' [Citation.] As long as there is access to the abutting road and from there to the next intersecting street in at least one direction, there is no legally cognizable impairment of access." (*Border Business Park*, *Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1557, quoting *Breidert, supra,* 61 Cal.2d at pp. 663-664.) A property owner is not entitled to compensation for access impairment that is not substantial, "even though the action of the public body may impede the convenience with which ingress and egress may thereafter be accomplished and may

17

necessitate circuity of travel to reach a given destination." (*People ex rel. Department of Public Works v. Becker* (1968) 262 Cal.App.2d 634, 641.)

In *Price*, as a result of construction of a rail transit line in the center of a north-south street (Cuyamaca Street), direct vehicular access to the appellant's corner property became unavailable from the street's southbound lanes, but remained available from the street's northbound lanes and from an east-west street abutting the property. (*Price*, *supra*, 37 Cal.App.4th at p. 1543.) This court noted that the trial court in *Price* "considered evidence that the access impairment only increased the distance of travel from the property to the southbound lanes of Cuyamaca Street, that the highest and best use of the property before and after the impairment remained the same, and that the property could be used for the same purposes before and after the impairment. There was no evidence that the impairment would prevent or deter access to any particular type of vehicle, like a delivery truck, or decrease the number of vehicles to which the property is available." (*Id.* at p. 1548.) The *Price* court concluded this evidence was substantial and sufficient to support the trial court's determination that the rail line project did not substantially impair access to the appellant's property. (*Id.* at p. 1549.)

Here, the evidence was similarly sufficient to support the trial court's implied finding that Vanta's access to his remaining land was not substantially impaired. The court could reasonably find there was no substantial impairment of Vanta's access to his property in the before condition because SANDAG provided Vanta reasonable replacement access. (See *Williams Place*, *LLC v. State ex rel. Dep't of Transp.* (Wash.Ct.App. 2015) 348 P.3d 797, 815 [landowner is not entitled to compensation for

18

impairment of access resulting from street vacation if the landowner still retains an alternate mode of egress from or ingress to his land, even if less convenient]; *State ex rel. Commissioner of Transportation v. Dikert* (N.J.Super.Ct.App.Div. 1999) 725 A.2d 119, 124 [property owners were not entitled to compensation for loss of access to their property as a result of condemnation of their easement because the State provided a reasonable alternative means of access].)  There was no evidence that replacing Vanta's *potential* direct access with *potential* access over the replacement easement affected the highest and best use of the remaining property—whatever that use may be—and there was no evidence that the change in potential access would prevent or deter access to any particular type of vehicle or decrease the number of vehicles to which the property is available.

Moreover, there was evidence supporting a reasonable inference that building a road over the replacement easement would not be more burdensome than building an access road over Vanta's property in the before condition.  Robert Caringella, a real estate appraiser called by SANDAG, was asked whether Vanta was "better off having that replacement easement than owning the strips that were taken from him[.]"  Caringella testified: "I think that once you pay for the fee strip, that easement provides adequate access to the remainder parcel.  So it's - - it's as good - - or in some cases, it might be a little bit better because of shared cost.  It's already partway up the hill.  [¶]  One of the problems with the lower access road [Vanta could have built over the condemned property in the before condition] is that you have to chase it up the steep slope.  At least with the replacement road, we're partway up the hillside already."  Caringella explained

19

that condemned strip of land "doesn't really help much getting up . . . to the upper level unless you provide a steep road or you grade it down."  He did not think it would be more difficult to build a road over the replacement easement than it would have been over the land taken, and concluded that the access SANDAG provided to Vanta's remaining property over the replacement easement did not change the value of the remainder.

Jeffrey Barfield, a certified land use planner that SANDAG called, testified that the access road Vanta would have built but for the taking would not have been a simple driveway but rather an "access roadway" that would have to meet various standards— e.g., fire access standards.  Barfield further testified that the conceptual development plan prepared by Vanta's expert for access to Vanta's upper 7.7 acre flat pad would require access with a steepness of 18 percent, and that the City would not approve a driveway or industrial street with an 18 percent grade.

There was also evidence supporting a reasonable inference that the cost to Vanta of building a road over the replacement easement would not be greater than the cost of building a road over the land taken from Vanta because the cost of constructing the former would be borne by all of the property owners who shared the replacement easement.  As noted, Caringella testified that access over the replacement easement "might be a little bit better because of shared cost."  Vanta's valuation expert Van Tassel acknowledged that Vanta would have borne the entire cost of constructing a road in the before condition but, by statute, other easement holders would share in the cost of a road over the after-condition easement.  Roberto de Gregorio, one of a number of owners of other property served by the replacement easement, testified that SANDAG improved

20

prospects for developing the property by providing the easement. He stated that "[SANDAG] allowed a road in for us[,]" and that notwithstanding the project, "we are still able to do a development that will be feasible for us in the future."

The evidence that constructing an access road over the replacement easement would not be more burdensome or costly to Vanta than constructing access over the condemned property would have been supports the court's implied finding that SANDAG's partial taking of Vanta's property did not substantially impair his access to his remaining property. In light of that finding, the court did not err in refusing to instruct the jury to determine whether the fair market value of Vanta's remaining property had been decreased by impairment of access.

To the extent the court's refusal to specifically instruct the jury to consider impairment of access in determining severance damages was error, the error was harmless because Vanta presented evidence to the jury that the taking impaired access to his remaining land and the jury's verdict reflects that its award of severance damages included compensation for impairment of access. The court instructed the jury with CACI No. 3511, a general instruction on severance damages that directed the jury to determine the fair market value of Vanta's remaining property on the valuation date (Aug. 7, 2012) by subtracting the fair market value of the part taken from the fair market value of the entire property, determine the fair market value of the remaining property after completion of the project, and then subtract the fair market value of remaining property after project completion from the fair market value of the remaining property on August 7, 2012. The court also instructed the jury that "[i]n determining fair market

21

value you must consider *any condition that affects the value of the property* if the condition existed on August 7, 2012 but was discovered after that date." (Italics added.)

One of Vanta's two theories of severance damages was that the remainder lost value, in Vanta's words, "because of the loss of exclusive management and control of the access to the remainder *caused by the impairment of access from access over fee simple land to access over the non-exclusive easement*." (Italics added.) Under that theory Vanta sought severance damages of $764,903. Vanta presented evidence that development of an access road on the replacement easement would be more difficult and expensive than developing one in the before condition would have been. The jury visited the site and presumably viewed firsthand both the area of the replacement easement and the area of potential access to Vanta's property in the before condition. The jury submitted a question during its deliberations that showed the jurors were considering the cost of constructing access over the replacement easement.[9] Vanta acknowledges that the jury accepted his impaired-access theory of severance damages in awarding him severance damages in the amount of $765,046.

Thus, even though the court impliedly found there was no substantial impairment of access, the jury's verdict shows that it considered the effect of the taking on Vanta's access to the remainder in determining the reduction on the market value of the remainder as a result of the taking. Vanta was allowed to put on evidence that the taking and

---

9    The jury sent a written note asking for a copy of the testimony of SANDAG's right-of-way expert, Jane Wiggans, "regarding cost of replacement easement as a dirt road[.]"

22

replacement easement impaired his access to his remaining property and the jury presumably took that into consideration in assessing severance damages. Even assuming the court erred in refusing Vanta's proposed instruction regarding impairment of access, we conclude the error was harmless because the jury's verdict reflects that the jury considered the effect of the taking on Vanta's access to his remaining property in awarding severance damages. The judgment is not subject to reversal for instructional error.

### III. *Attorney Fee Award*

Vanta's contention that the court erred by not including his counsel's contingency fee in his attorney fee award is moot in light of our reversal of the attorney fee award, discussed below.

### *SANDAG'S APPEAL*

### I. *Denial of SANDAG 's Motion In Limine to Exclude the Opinions of Vanta's Valuation Expert*

As noted, the court denied SANDAG's motion in limine to exclude the expert opinions of Vanta's designated expert Van Tassel regarding (1) the value of the property being taken; (2) the amount of damage to the remainder of the larger parcel from which the property was taken; (3) the amount of benefit to the remainder; and (4) the amount of any other compensation required to be paid. SANDAG contends the court abused its discretion and caused SANDAG prejudice by denying its motion in limine. SANDAG asks that we reverse the judgment and remand with directions to exclude Van Tassel's opinions and testimony on valuation and severance damages on retrial because Vanta

23

failed to provide a statement of valuation data with his designation of Van Tassel as an expert witnesses.

Considering the circumstances surrounding the parties' exchange of expert witness information in this case, including apparent confusion as to whether the expert witness exchanges the court ordered at the CMC were under the Eminent Domain Law (§ 1230.010 et seq.) or the Civil Discovery Act (§ 2016.010 et seq.), we conclude the court did not abuse its discretion in denying SANDAG's motion in limine to exclude Van Tassel's opinions.

The statutes that govern exchanges of lists of experts in civil actions other than eminent domain cases (§ 2034.210 et seq.) do not apply to expert exchanges in eminent domain cases. (§ 2034.010.) "The discovery statutes applicable to an eminent domain action require each party to serve upon the opposing party its list of expert witnesses and a statement of valuation data not later than the date set for exchange of this information. (See §§ 1258.230, 1258.250.) Section 1258.220 provides that, unless another date is agreed to by the parties or set by court order on good cause shown, the parties to a condemnation proceeding are to exchange statements of valuation data 90 days before trial. (§ 1258.220, subd. (a).) A statement of valuation data must be exchanged for each witness who will testify to his opinion regarding the value of the land and any other amount of compensation required under the Eminent Domain Law. (§ 1258.250, subds. (a), (d).) Among other items, the statements must disclose: (1) the witness's opinion of value; (2) the date of valuation used by the witness; (3) all comparable sales, replacement cost calculations, and net income projections supporting the expert's opinion;

24

and (4) the names of all other experts on whom the expert is relying. (§ 1258.260, subds. (a)-(c).)

"Absent relief from the court, a designated expert cannot testify for a party in its case-in-chief unless the party timely served a statement of valuation data, and the expert cannot testify as to any opinion or data that was required to be included in the statement pursuant to section 1258.250, but was omitted. (§ 1258.280, subd. (c).) The intent behind providing a sanction is 'to insure that the parties make a good faith exchange of lists of expert witnesses and essential valuation data.' [Citation.] [¶] Section 1258.290 authorizes the court to relieve a party from its default under the eminent domain discovery provisions if: (1) the party made a good faith effort to comply by the date of exchange and gave written notice of any changes necessary in its statement thereafter (see § 1258.270); and (2) either the party could not in the exercise of reasonable diligence have determined that changes were necessary in its expert's opinion or data, or the failure to provide a complete valuation statement was the result of mistake, inadvertence, surprise, or excusable neglect. (§ 1258.290, subd. (a).) Section 1258.290 further provides that in determining whether to provide relief under the statute, the court must take into account the extent to which the opposing party relied upon the original statement of valuation data and would be prejudiced by allowing the expert's testimony. (§ 1258.290, subd. (b).)" (*Escondido Union School Dist. v. Casa Suenos De Oro, Inc.* (2005) 129 Cal.App.4th 944, 977.)

As noted, at the CMC in this case, the court ordered a first expert witness exchange to be completed by July 5 and a second expert witness exchange to be

25

completed by July 19, 2013. SANDAG served a list of experts and a statement of valuation data under section 1258.260 on July 3, 2013. Vanta served an initial expert witness designation on July 5, 2013, that stated the designation was in accordance with section 2034.210 and a second expert designation "in accordance to Section 2034.280"[10] on July 19, 2013, but did not serve valuation data with either designation.

In its order awarding Vanta attorney fees, the court made the following findings regarding the exchange of expert information and valuation data, which are largely undisputed: "The court held a Case Management Conference on April 19, 2013 and set dates, including dates for the trial and expert exchanges. [SANDAG] interpreted this to include the exchange of valuation under Eminent Domain Law because [its] counsel asked the court to set dates 'per code,' meaning under Eminent Domain Law. . . . [Vanta] apparently interpreted the order for exchange of expert witness information only. There is no evidence presented that either the parties or the court specifically indicated at the CMC that the expert exchange set by the court included valuation data. [SANDAG] did not serve a demand for statements of valuation data [under section 1258.210] within ten days after the trial date was selected. . . . [¶] Instead, on July 3, 2013, [SANDAG] timely served its expert exchange and included a Statement of Valuation Data, indicating that

---

10    Unlike section 2034.280, which applies to civil actions other than eminent domain actions and allows a party to submit a second or "supplemental" expert witness list to designate experts on a subject to be covered by an adverse party's expert that was not covered by an expert on the party's initial expert witness list, the Eminent Domain Law provides for a single exchange of expert witnesses and statements of valuation data (§§ 1258.210-1258.260), although a party may amend an expert witness list under circumstances specified in section 1258.270.

[SANDAG's] expert valued the take at $625,300. . . . [Vanta] timely provided both the first and second expert designations, but did not provide valuation information. [SANDAG] objected to both expert witness designations because valuation data was not included.

"On August 2, 2013, [SANDAG] served a notice of deposition for [Vanta's] appraisal expert, Gerry Van Tassel, with the deposition to be held on August 26, 2013. On August 20, 2013, [SANDAG] was informed that Mr. Van Tassel would not be available on that date. [SANDAG] reset the date to August 30, 2013, although [Vanta] had proposed September 6, 2013. On August 30, 2013, the day the deposition was to be held, [Vanta's] counsel notified [SANDAG's] counsel that Mr. Van Tassel had the flu. [SANDAG] reset the deposition to September 4, 201[3]. . . . This date was two days before [SANDAG's] offer was due on September 6, 2013 pursuant to CCP § 1250.410(a).

"Apparently, Mr. Van Tassel's expert appraisal report was not completed until August 29, 2013. At the September 4, 2013 deposition, [SANDAG] was provided with a September 3, 2013 appraisal report. . . .

"Once [SANDAG] received [Vanta's] valuation offer, which included severance damages, [SANDAG] made its initial offer of $687,830 on its opinion of value at $625,300. The offer included attorney fees, but not severance damages. After further review of [Vanta's] September 3, 2013 appraisal report, [SANDAG] increased its offer to $805,800 on September 16, 2013. This amount still did not include severance damages but exceeded the $781,000 [SANDAG] had on deposit. . . . [¶] Although [SANDAG] argues that it did not have sufficient time to prepare its offer, the court is not convinced

27

that it is the sole fault of [Vanta]. There was confusion about the expert exchange. The parties could have come to the court for clarification and/or resolved it themselves. However, this was not done by either party."

During oral argument on motions in limine, the court explained its tentative decision to deny SANDAG's motion to exclude Van Tassel's expert testimony as follows: "And the reason for that one is, at the case management conference, I did not specify that the statement of valuation was to be exchanged when I set the dates for expert exchange. So the Court is taking partial fault for that." Counsel for SANDAG stated to the court, "You were informed [at the CMC] that this was an eminent domain case. And at that particular time, you set the requirements for the exchange, for first exchange and the second exchange." The court responded, "Just like I do with any regular case." The court added, "Nobody said anything special about eminent domain, and I didn't key in on anything special." The court later stated, "Well, again, the Court bears some responsibility here because I was not specific when I gave the [expert exchange] dates and talked about the designation."

The court stated it was "willing to make some accommodation" for any prejudice SANDAG suffered as a result of the timing of its receipt of Vanta's valuation data. SANDAG's counsel responded that "we will be revisiting this issue during the course of the trial because of Mr. Van Tassel's appraisal approaches." After counsel reiterated that he was going to bring up issues regarding Van Tassel's appraisal during the course of trial, the court asked, "So you're not interested in delaying the trial to do the –" and SANDAG's counsel interjected, "Not at all." The court stated, "All right. I just wanted

28

to give you that opportunity. Okay. All minds clear on that one?" Vanta's counsel responded, "Yeah, that's fine."

The court's comments on the record show that at the CMC, the court was not mindful that because this was an eminent domain case, the exchange of expert witness information should have been in accordance with the eminent domain statutes. The parties bear some responsibility for the court's oversight because neither raised the point at the CMC. Had the court been reminded that this was an eminent domain case and been asked whether statements of valuation should accompany parties' expert witness lists as required by the relevant eminent domain statutes, it is highly probable that the court would have put the case on the proper eminent domain track and ordered the parties to exchange expert information in compliance with sections 1258.240 through 1258.270.

SANDAG cannot be heard to complain on appeal that it was prejudiced by Vanta's untimely submission of valuation data because the court offered to cure any such prejudice by continuing the trial and SANDAG declined the offer. Further, as the trial court noted in its attorney fee order, Vanta provided the valuation data to SANDAG on September 4, 2013, which was 41 days before the first day of trial (Oct. 15, 2013) and 54 days before SANDAG's counsel cross-examined Van Tassel. SANDAG filed an amended statutory offer of just compensation on September 16, 2013, after receiving Vanta's valuation data. Based on these circumstances, the trial court could reasonably find that SANDAG was not prejudiced by the timing of Vanta's provision of valuation

29

data.  The court did not abuse its discretion in denying SANDAG's motion in limine to exclude Van Tassel's expert opinions.[11]

## II. *Award of Attorney Fees to Vanta*

SANDAG contends the court erred in awarding Vanta any attorney fees under section 1250.410.  SANDAG essentially argues the award to Vanta under section 1250.410 should be reversed because there was insufficient evidence to support the trial court's findings that SANDAG's final offer was unreasonable and Vanta's final demand was reasonable.

Section 1250.410 is intended to protect the property owners from unnecessary litigation over the value of the property sought to be condemned.  (*Tracy Joint Unified School Dist. v. Pombo* (2010) 189 Cal.App.4th 889, 895 (*Pombo*).)  Section 1250.410 provides, in pertinent part:  "(a) At least 20 days prior to the date of the trial on issues relating to compensation, the plaintiff shall file with the court and serve on the defendant its final offer of compensation in the proceeding and the defendant shall file and serve on the plaintiff its final demand for compensation in the proceeding. . . .  These offers and demands shall be the only offers and demands considered by the court in determining the entitlement, if any, to litigation expenses. . . .  [¶]  (b) If the court, on motion of the

---

[11]    We do not specifically address SANDAG's separately headed argument that Vanta's actions throughout the case prejudiced SANDAG, because that argument essentially rehashes SANDAG's argument that the court prejudicially erred by not excluding Van Tassel's expert opinion testimony based on Vanta's failure to exchange valuation data.  We also do not address the parties' arguments regarding whether the court's decision to deny SANDAG's motion in limine and allow Van Tassel to give expert testimony was proper under section 1258.290 because the record does not indicate that the court granted relief under that statute.

defendant made within 30 days after entry of judgment, finds that the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding, the costs allowed pursuant to Section 1268.710 shall include the defendant's litigation expenses. [¶] . . . [¶] (d) If timely made, the offers and demands as provided in subdivision (a) shall be considered by the court on the issue of determining an entitlement to litigation expenses."

Thus, section 1250.410 "requires the trial court to find '*both* that the owner's demand was reasonable *and* that the agency's offer was unreasonable.' " (*Inglewood Redevelopment Agency v. Aklilu* (2007) 153 Cal.App.4th 1095, 1117 (*Inglewood*).) "Several factors have emerged as general guidelines for determining the reasonableness or unreasonableness of offers. They are ' "(1) the amount of the difference between the offer and the compensation awarded, (2) the percentage of the difference between the offer and award . . . and (3) the good faith, care and accuracy in how the amount of offer and the amount of demand, respectively, were determined." ' [Citation.] Thus, the mathematical relation between the condemner's highest offer and the award is only one factor that should enter into the trial court's determination." (*Continental*, *supra*, 16 Cal.4th at p. 720.) The California Supreme Court in *Continental* disapproved "any pronouncement purporting to find unreasonableness as a matter of law based purely on mathematical disparity, and to commend the lower courts in every case to consider not only the numerical figures, but also ' " 'the good faith, care and accuracy in how the amount of the offer and the amount of the demand, respectively, were determined.' " ' "

31

(*Id.* at pp. 720-721.)  The factors specified in *Continental* for determining whether a condemner's offer is reasonable also apply to the court's determination of whether a condemnee's demand is reasonable.  (*County of Contra Costa v. Pinole Point Properties, Inc.* (1994) 27 Cal.App.4th 1105, 1115 (*Pinole*).)

"The question of reasonableness is addressed to the court's discretion, to be exercised 'after weighing all the evidence and assessing witness credibility independently of the jury.' " (*People ex rel. Dept. of Transportation v. Yuki* (1995) 31 Cal.App.4th 1754, 1763.)  "On appeal the trial court's decision must be upheld if supported by substantial evidence." (*Id.* at p. 1765.)  "While the question of reasonableness is typically one of fact, as with any finding by a trial court, 'if the uncontradicted evidence permits only one conclusion, the issue is legal, not factual [citation].' " (*Pinole*, *supra*, 27 Cal.App.4th at p. 1115.)

Regarding SANDAG's offer, the court in its written order noted the jury awarded Vanta $1,441,95.20 of which $765,046 was severance damages.  The court stated: "[SANDAG's] final offer was $805,800 for the property taken and included attorneys' fees and expenses. . . .  [SANDAG] did not offer severance damages, although [Vanta] claimed severance damages.  [SANDAG's] final offer was 55% of the jury's verdict and is thus unreasonable unless [SANDAG] produces significant countervailing evidence that its offer was nonetheless made in good faith and with reasonable care."

The court found that SANDAG's offer was not made in good faith and with reasonable care because it did not specifically include severance damages.  The court stated:  "[SANDAG] argues it did not include severance damages because [Vanta]

32

received replacement access to his property comparable to his proposed access. But this did not take into account the fact that the jury might not agree and the difference between its offer and [Vanta's] demand. [¶] The difference between [SANDAG's] final offer and [Vanta's] demand was $2.44 million. [SANDAG's] offer included attorneys' fees while [Vanta's] demand did not. [Vanta] included severance damages; [SANDAG] did not specifically include severance damages. Under these facts, it appears a reasonable condemner would have submitted an offer that, at minimum, took into account the differences between their positions and the risk that the jury will not accept [SANDAG's] expert's testimony that there were no severance damages. . . . [¶] Taken with the fact that the offer was less than 60% of the jury verdict, the court does not find [SANDAG] has produced substantial evidence that its offer was nonetheless made in good faith and with reasonable care."

The court explained its finding that Vanta's demand was reasonable as follows: "[Vanta's] final demand was $3,250,000 for the taking and severance damages, but did not include[] attorneys' fees, costs, expenses or interest. . . . The jury verdict was 44% of [Vanta's] final demand, exclusive of attorneys' fees, litigation expenses and costs. [¶] At trial, the court excluded some of [Vanta's] evidence for damages, which eliminated some of the severance damages that were included in the offer, so the percentage of the jury verdict alone is not indicative of [Vanta's] good faith, care, and accuracy in the method of determination of the demand. In making the demand, [Vanta] relied on his expert and while those amounts had to be recalculated during trial, at the time the demand was made, it appears to have been made in good faith and with reasonable care."

33

The record does not support the trial court's finding that Vanta's demand was reasonable. We conclude the demand was unreasonable as a matter of law "viewed in the light of the evidence admitted and the compensation awarded in the proceeding . . . ." (§1250.410, subd. (b).) SANDAG's offer was much closer to the jury's award than was Vanta's demand. While the jury's award of $1,441,095 was approximately 79 percent above SANDAG's offer of $805,800, Vanta's demand of $3,250,000 was more than *double* (approximately 126 percent above) the jury's award.

In *New Haven Unified School Dist. v. Taco Bell Corp.* (1994) 24 Cal.App.4th 1473 (*New Haven*), the Court of Appeal concluded that the trial court erred by, among other things, awarding litigation expenses under section 1250.410 to a condemnee whose demand was about double the trial court's award and had to be reduced further in conformance with the Court of Appeal's decision. (*New Haven, supra,* at pp. 1485-1486.) The Court of Appeal stated that it had "found no precedent for awarding litigation expenses where the demand is so disproportionate to the actual award. (*Id.* at pp. 1486.) In *Pinole*, the Court of Appeal reversed an award of litigation expenses to a condemnee whose "1 million demand was a staggering $800,000 more than the actual award." (*Pinole*, *supra*, 27 Cal.App.4th at p. 1115.) Noting the demand was five times greater than the award, the *Pinole* court stated that "[t]his alone suggests the demand was unreasonable." (*Ibid.*) Although the California Supreme Court has directed trial courts "to consider not only the numerical figures but also ' " 'the good faith, care and accuracy in how the amount of the offer and the amount of the demand, respectively, were determined[,]' " ' " (*Continental*, *supra*, 16 Cal.4th at pp. 720-721), *New Haven* and

34

*Pinole* illustrate that a demand can be so highly disproportionate to the ultimate award that it may be viewed as presumptively unreasonable.

We conclude that the great mathematical disparity between Vanta's demand and the jury's award warrants a finding that the demand is unreasonable unless there is significant countervailing evidence of good faith, care and accuracy in the calculation of the demand. (See *Pombo*, *supra*, 189 Cal.App.4th at p. 898 ["[W]here mathematical comparisons would ordinarily dictate an award to the owner, a trial court may properly deny litigation expenses where there is significant countervailing evidence that the condemner's offer was nonetheless made in good faith and with reasonable care."].) We conclude there is insufficient countervailing evidence of care and accuracy in the preparation of Vanta's demand to overcome the presumption of unreasonableness arising from the mathematical disparity between the demand and the jury's award.

The lack of care and accuracy in the calculation of Vanta's demand is primarily evidenced by the demand's inclusion of $915,960 in "cost to cure" severance damages that the trial court properly ruled in limine were not available. As noted, the trial court excused Vanta's inclusion of these inadmissible severance damages in his demand by reasoning that because it had excluded "some of the severance damages that were included in the [demand], . . . the percentage of the jury verdict alone is not indicative of [Vanta's] good faith, care, and accuracy in the method of determination of the demand. In making the demand, [Vanta] relied on his expert and while those amounts had to be recalculated during trial, at the time the demand was made, it appears to have been made in good faith and with reasonable care."

35

Thus, the court effectively ruled that although Vanta's demand was highly inflated based on its use of improper appraisal methodology and inadmissible evidence, the demand was nevertheless reasonable because Vanta relied on his expert's use of the improper methodology and was ignorant of its impropriety. Generally, however, a demand for compensation to which the condemnee is not legally entitled is unreasonable. (*Inglewood*, *supra*, 153 Cal.App.4th at pp. 1118-1119 [demand of business owner that included amounts for moveable equipment and fixtures was unreasonable because owner was not entitled to compensation for moveable equipment and did not own most of the fixtures on the property]; *City of San Leandro v. Highsmith* (1981) 123 Cal.App.3d 146, 159 [condemner's expert's declaration revealed clear evidence that condemnee's demand was not based on proper factual foundation and legal theory and was therefore unreasonable].) We conclude that because Vanta's demand was based on inadmissible evidence and improper methodology, it fails the reasonableness test under the factor of the care and accuracy in determining the demand, even though Vanta may in good faith have believed the demand was reasonable due to his reliance on his expert's valuation of the property.

Lack of care and accuracy in the determination of Vanta's demand is also evidenced by Van Tassel's use of inadmissible evidence of the listing prices of comparable properties to arrive at his valuation figure for Vanta's remaining property of $4 per square foot, reduced slightly to $3.83 per square foot based on the property's requiring "a longer than typical access road for the highest and best use." At trial, out of the presence of the jury, SANDAG's counsel objected that the listing price of a

36

comparable property is inadmissible under Evidence Code section 822 to determine the subject property's value.[12] The court observed that Van Tassel had in fact used the listings to adjust the value of Vanta's remaining property from $3.49 per square foot to $4 per square foot in his appraisal report. When the court indicated it would exclude evidence of the listings, Vanta's counsel stated that Van Tassel in his trial testimony would recalculate the value of the property as being $3.55 per square foot.[13] Lack of care and accuracy in Vanta's demand is further evidenced by the fact that the demand of $3,250,000, which Vanta made on September 6, 2013, was $628,200 more than the combined values of the land taken ($820,800) and severance damages ($1,807,400) stated in the appraisal report that Vanta had provided to SANDAG only two days earlier on September 4, 2013.

We conclude there was insufficient evidence to support the finding that Vanta's demand was reasonable within the meaning of section 1250.410. All three factors to be considered in determining whether a demand is reasonable–the amount of the difference

---

[12] Under Evidence Code section 822, subdivision (a)(2), the following is inadmissible and not properly considered as a basis for an opinion on the value of property: "The price at which an offer or option to purchase or lease the property or property interest being valued or any other property was made, or the price at which the property or interest was optioned, offered, or listed for sale or lease, except that an option, offer, or listing may be introduced by a party as an admission of another party to the proceeding; but nothing in this subdivision permits an admission to be used as direct evidence upon any matter that may be shown only by opinion evidence under Section 813."

[13] Van Tassel in his appraisal report adjusted the figure of $3.49 per square foot to $3.55 based on information regarding the sale of one of the comparable properties, and then adjusted the $3.55 figure to $4 based on the listing prices of three other comparable properties.

between the demand and compensation awarded, the percentage of the difference between the demand and award, and the good faith, care and accuracy in how the amount of the demand was determined–weigh against a finding that Vanta's demand was reasonable.  Because Vanta's demand was unreasonable as a matter of law, the court abused its discretion in awarding Vanta litigation expenses under section 1250.410.[14]

## DISPOSITION

The judgment is affirmed.  The order awarding Vanta attorney fees and expert fees under section 1250.410 is reversed.  The parties shall bear their own costs on appeal.

_____

HUFFMAN, J.

WE CONCUR:

_____

McCONNELL, P. J.

_____

NARES, J.

_____

[14]     Vanta filed a motion to strike portions of SANDAG's reply brief as being in violation of California Rules of Court, rule 8.216(b)(3) because it addresses issues raised in Vanta's appeal in addition to the issues raised in SANDAG's own appeal.  We deny Vanta's motion to strike in the interest of judicial economy, because California Rules of Court, rule 8.204(e)(2)(B) requires an appellate court to give a party who has filed a nonconforming brief " 'leave to file a new brief within a specified time.' "  However, we have disregarded the discussion in SANDAG's reply brief that does not comply with California Rules of Court, rule 8.216(b)(3).  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 268.)